NORTHEAST BANCORP, INC., ET AL. *v.* BOARD OF
GOVERNORS OF THE FEDERAL RESERVE
SYSTEM ET AL.

No. 84–363.   Argued April 15, 1985—Decided June 10, 1985

160

REHNQUIST, J., delivered the opinion of the Court, in which all other Members joined except POWELL, J., who took no part in the decision of the case. O'CONNOR, J., filed a concurring opinion, *post*, p. 178.

*Stephen M. Shapiro* argued the cause for petitioners. With him on the brief for petitioner Citicorp were *Ira M. Millstein, Robert L. Stern, James W. Quinn,* and *Jay N. Fastow. George D. Reycraft, John Boyer, Jeffrey Q. Smith, Gregory Scott Mertz,* and *Joseph Polizzotto* filed a brief for petitioners Northeast Bancorp, Inc., et al. The named attorneys filed a joint reply brief and supplemental memorandum for all petitioners.

*Solicitor General Lee* argued the cause for the federal respondent. With him on the brief were *Acting Assistant Attorney General Willard, Deputy Solicitor General Wallace, Anthony J. Steinmeyer,* and *Michael Kimmel. Laurence H. Tribe* argued the cause for respondents Bank of New England Corp. et al. With him on the briefs were *Bertram M. Kantor, Michael H. Byowitz, Mark A. Weiss, Stuart C. Stock, Wilmot T. Pope,* and *Douglas M. Kraus. Francis X. Bellotti,* Attorney General, *Jamie W. Katz,* Assistant Attorney General, and *Thomas R. Kiley,* First Assistant Attorney General, filed a brief for respondent Commonwealth of Massachusetts. *Joseph I. Lieberman,* Attorney General, *Elliot F. Gerson,* Deputy Attorney General, and *John G. Haines* and *Jane D. Comerford,* Assistant Attorneys General, filed a brief for respondents State of Connecticut et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York by *Robert Abrams,* Attorney General, *Robert Hermann,* Solicitor General, *R. Scott Greathead,* First Assistant Attorney General, and *Judith T. Kramer* and *Howard L. Zwickel,* Assistant Attorneys General; for Chase Manhattan Corp. by *Joseph A. Califano, Jr.,* and *Kent T. Stauffer;* for the David F. Bolger Revocable Trust by *William A. Harvey* and *Edward S. Ellers;* for the New York State Bankers Association by *John*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents Bank of New England Corporation (BNE), Hartford National Corporation (HNC), and Bank of Boston Corporation (BBC) are bank holding companies which applied to the Federal Reserve Board to obtain approval for the acquisition of banks or bank holding companies in New England States other than the ones in which they are principally located. Petitioners Northeast Bancorp, Inc., Union Trust Company, and Citicorp opposed these proposed acquisitions in proceedings before the Board. The Board approved the acquisitions, and the Court of Appeals for the Second Circuit affirmed the orders of the Board. Petitioners sought certiorari, contending that the acquisitions were not authorized by the Bank Holding Company Act of 1956, 70 Stat. 133, as amended, 12 U. S. C. § 1841 *et seq.*, and that, if they were authorized by that Act, the state statutes which permitted the acquisitions in each case violated the Commerce Clause and the Compact Clause of the United States Constitution. We granted certiorari because of the importance of these issues, 469 U. S. 810, and we now affirm.

The Bank Holding Company Act (BHCA) regulates the acquisition of state and national banks by bank holding com-

*Leferovich, Jr.;* for Senator Alphonse D'Amato et al. by *J. Robert Lunney;* and for Frank L. Morsani by *Dewey R. Villareal, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the State of Georgia by *Michael J. Bowers,* Attorney General, *James P. Googe, Jr.,* Executive Assistant Attorney General, *H. Perry Michael,* First Assistant Attorney General, *Verley J. Spivey,* Senior Assistant Attorney General, and *Grace E. Evans,* Assistant Attorney General; for Bank of New York Co., Inc., by *John L. Warden;* for the Conference of State Bank Supervisors by *Erwin N. Griswold, James F. Bell,* and *Arthur E. Wilmarth, Jr.;* for the Council of State Governments et al. by *Joyce Holmes Benjamin* and *Vicki C. Jackson;* for Fleet Financial Group, Inc., by *Allan B. Taylor, J. Bruce Boisture, Robert M. Taylor III,* and *Edward W. Dence, Jr.;* and for Bob Graham, Governor of Florida, et al. by *J. Thomas Cardwell, Sydney H. McKenzie III, S. Craig Kiser,* and *Carl B. Morstadt.*

*Robert F. Mullen* filed a brief for the New York Clearing House Association as *amicus curiae.*

panies. The Act generally defines a bank as any institution organized under state or federal law which "(1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U. S. C. § 1841(c). The Act defines a bank holding company as any corporation, partnership, business trust, association, or similar organization that owns or has control over a bank or another bank holding company. §§ 1841(a)(1), (b); see § 1841(a)(5). Before a company may become a bank holding company, or a bank holding company may acquire a bank or substantially all of the assets of a bank, the Act requires it to obtain the approval of the Federal Reserve Board. § 1842.

The Board will evaluate the proposed transaction for anticompetitive effects, financial and managerial resources, community needs, and the like. § 1842(c). In addition, § 3(d) of the Act, 12 U. S. C. § 1842(d), known as "the Douglas Amendment," prohibits the Board from approving an application of a bank holding company or bank located in one State to acquire a bank located in another State, or substantially all of its assets, unless the acquisition "is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication." Pursuant to the Douglas Amendment, a number of States recently have enacted statutes which selectively authorize interstate bank acquisitions on a regional basis. This case requires us to consider the validity of these statutes.

From 1956 to 1972, the Douglas Amendment had the effect of completely barring interstate bank acquisitions because no State had enacted the requisite authorizing statute. Beginning in 1972, several States passed statutes permitting such acquisitions in limited circumstances or for specialized purposes. For example, Iowa passed a grandfathering statute which had the effect of permitting the only out-of-state bank holding company owning an Iowa bank to maintain and expand its in-state banking activities, Iowa Code § 524.1805 (1983); see *Iowa Independent Bankers* v. *Board of Gover-*

*nors*, 167 U. S. App. D. C. 286, 511 F. 2d 1288, cert. denied, 423 U. S. 875 (1975); Washington authorized out-of-state purchasers to acquire failing local banks, Wash. Rev. Code § 30.04.230(4)(a) (Supp. 1985); and Delaware allowed out-of-state bank holding companies to set up special purpose banks, such as credit card operations, in Delaware so long as they do not compete in other respects with locally controlled full-service banks, Del. Code Ann., Tit. 5, § 801 *et seq.* (Supp. 1984).

Beginning with Massachusetts in December 1982, several States have enacted statutes lifting the Douglas Amendment ban on interstate acquisitions on a reciprocal basis within their geographic regions. The Massachusetts Act specifically provides that an out-of-state bank holding company with its principal place of business in one of the other New England States (Connecticut, Maine, New Hampshire, Rhode Island, and Vermont), which is not directly or indirectly controlled by another corporation with its principal place of business located outside of New England, may establish or acquire a Massachusetts-based bank or bank holding company, provided that the other New England State accords equivalent reciprocal privileges to Massachusetts banking organizations. Mass. Gen. Laws Ann., ch. 167A, § 2 (West 1984). In June 1983, Connecticut followed suit by adopting a substantially similar statute. 1983 Conn. Pub. Acts 83–411.

The other New England States have taken different courses or have not acted. Rhode Island, in May 1983, authorized acquisition of local banks by out-of-state bank holding companies on a reciprocal basis similarly limited to the New England region, but this geographic limitation will expire on June 30, 1986, after which the authorization will extend nationwide subject only to the reciprocity requirement. R. I. Gen. Laws § 19–30–1 *et seq.* (Supp. 1984). Since February 1984, Maine has permitted banking organizations from all other States to acquire local banks without any

reciprocity requirement. Me. Rev. Stat. Ann., Tit. 9–B, § 1013 (Supp. 1984–1985). At the other extreme, New Hampshire and Vermont have not enacted any statute releasing the Douglas Amendment's ban on interstate bank acquisitions.

One predictable effect of the regionally restrictive statutes will apparently be to allow the growth of regional multistate bank holding companies which can compete with the established banking giants in New York, California, Illinois, and Texas. See 740 F. 2d 203, 209, and n. 16 (1984). The Massachusetts and Connecticut statutes have prompted at least 15 other States to consider legislation which, according to the Federal Reserve Board, would establish interstate banking regions in all parts of the country. 70 Fed. Res. Bull. 374, 375–376 (1984). At least seven of these States have already enacted the necessary statutes.

Two months after Connecticut passed its statute, BNE applied to the Board for approval of its merger with respondent CBT Corporation (CBT), a Connecticut bank holding company, and thereby to acquire indirectly the Connecticut Bank and Trust Company, N. A., of Hartford, Connecticut. Soon thereafter HNC applied to the Board for approval of the acquisition of Arltru Bank Corporation (Arltru), a Massachusetts bank holding company which owns the Arlington Trust Company, a bank located in Lawrence, Massachusetts. Finally BBC applied to the Board for approval of the acquisition of the successor by merger to Colonial Bancorp, Inc., a Connecticut bank holding company, by which it would acquire Colonial Bank of Waterbury, Connecticut.

Citicorp offers financial services to consumers and businesses nationally through its bank and nonbank subsidiaries. In response to the Board's invitation for comments from interested persons on these three proposed acquisitions, Citicorp submitted comments opposing all three of them. Northeast owns petitioner Union Trust Company, a Connecticut bank that competes directly with banks owned by CBT,

HNC, and Colonial. In addition, Bank of New York Corporation has agreed to acquire Northeast if Connecticut or the United States enacts the necessary enabling legislation. Northeast and Union Trust submitted comments opposing BNE's application to acquire CBT.

The petitioners challenged the applications in part on the ground that the Douglas Amendment did not authorize them, and in part on the grounds that the Massachusetts and Connecticut statutes, by discriminating against non-New England bank holding companies, violated the Commerce, Compact, and Equal Protection Clauses of the Federal Constitution. They claimed, therefore, that the proposed interstate acquisitions were not authorized by valid state statutes as required by the Douglas Amendment. The Board rejected these arguments. It first determined that the BNE-CBT and BBC-Colonial acquisitions were specifically authorized by the Connecticut statute and the HNC-Arltru acquisition was specifically authorized by the Massachusetts statute, and therefore that the Douglas Amendment would not prevent the Board from approving any of the three proposed transactions.

The Board then rejected the constitutional challenge to the two state statutes. In doing so, it noted that it would hold a state statute unconstitutional only if there was "clear and unequivocal evidence" of its unconstitutionality. 70 Fed. Res. Bull. 353, 354 (1984); id., at 376; 70 Fed. Res. Bull. 524, 525–526 (1984). While stating that "the issue is not free from doubt," it concluded that this standard had not been met. 70 Fed. Res. Bull, at 376–377. Interpreting the statutory language and the legislative history of the Douglas Amendment, it determined that "the Douglas Amendment should be read as a renunciation of federal interest in regulating the interstate acquisition of banks by bank holding companies." Id., at 380. This renunciation of federal interest eliminated any objection to the statutes under the Compact Clause or dormant Commerce Clause.

The Board also found nothing in the history of the Amendment to suggest that "the states were to be permitted only to choose between not allowing out-of-state bank holding companies to enter, and allowing completely free entry." *Id.*, at 386. The Board disposed of the equal protection challenge by reasoning that the regional restriction in the two statutes was "rationally related to an attempt to maintain a banking system responsive to local needs in New England." *Id.*, at 381. The Board then analyzed the proposed transactions in light of the relevant statutory considerations set out in 12 U. S. C. §§ 1842(c) and 1843(c)(8) and approved the applications.

Pursuant to 12 U. S. C. § 1848, which provides that "[a]ny party aggrieved by an order of the Board" may seek review in a federal court of appeals, and § 1850, which permits prospective competitors to be aggrieved parties under § 1848, Citibank, Northeast, and Union Trust petitioned the Court of Appeals for the Second Circuit to review the Board's order approving the BNE-CBT acquisition. Citibank also petitioned for review of the HNC-Arltru acquisition, and Northeast and Union Trust were permitted to intervene. These petitions were consolidated and the acquisitions stayed pending expedited review. Meanwhile, the Board stayed its order approving the BBC-Colonial acquisition, and the Court of Appeals consolidated a petition filed by Citicorp for review of that transaction with the two other pending review petitions. The court also permitted BBC, BNE, CBT, HNC, the State of Connecticut, and the Commonwealth of Massachusetts to intervene. The Court of Appeals affirmed the Board's orders approving the three applications in all respects. 740 F. 2d 203 (1984). It agreed with the Board's determination that the Connecticut and Massachusetts statutes satisfied the terms of the Douglas Amendment, and it then rejected challenges to the Board's orders under the Commerce Clause, the Compact Clause, and the Equal Protection Clause. The Court of Appeals stayed its mandate

and ordered that the status quo be maintained pending disposition by this Court.

## The Douglas Amendment

The Douglas Amendment to the BHCA prohibits the Board from approving the application of a bank holding company or a bank located in one State to acquire a bank located in another State, or substantially all of its assets, unless the acquisition "is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication." § 1842(d). Clearly the proposed acquisitions with which we deal in this case must be consistent with the Douglas Amendment, or they are invalid as a matter of federal statutory law. If the Massachusetts and Connecticut statutes allowing regional acquisitions are not the type of state statutes contemplated by the Douglas Amendment, they would not lift the ban imposed by the general prohibition of the Douglas Amendment. While petitioners blend together arguments about the meaning of the Douglas Amendment with arguments about the effect of the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, we think the contentions are best treated separately.

The Board resolved the statutory issue in favor of the state statutes, concluding that they were the sort of laws contemplated by the Douglas Amendment. While the Board apparently does not consider itself expert on any constitutional issues raised, it is nonetheless an authoritative voice on the meaning of a federal banking statute. *Securities Industry Assn.* v. *Board of Governors of Federal Reserve System,* 468 U. S. 207 (1984). The Board may have applied a higher standard than was necessary when it analyzed the Douglas Amendment to see whether there was a "clear authorization" for selective lifting of the ban, such as the Massachusetts and Connecticut statutes undertake to do. Whether or not so stringent a standard was applicable, we think the Board was correct in concluding that it was in fact met in this case.

The language of the Douglas Amendment plainly permits States to lift the federal ban entirely, as has been done by Maine. It does not specifically indicate that a State may partially lift the ban, for example in limited circumstances, for special types of acquisitions, or for purchasers from a certain geographic region. On the other hand, it also does not specifically indicate that a State is allowed only two alternatives: leave the federal ban in place or lift it completely. The Board concluded that the language "does not appear *on its face* to authorize discrimination" by region or "to meet the stringent test of explicitness laid down by" this Court in the dormant Commerce Clause cases. 70 Fed. Res. Bull., at 384. We need not resolve this issue because we agree with the Board that the legislative history of the Amendment supplies a sufficient indication of Congress' intent.

At the time of the BHCA, interstate branch banking was already prohibited by the McFadden Act. 12 U. S. C. § 36(c). The bank holding company device, however, had been created to get around this restriction. A holding company would purchase banks in different localities both within and without a State, and thereby provide the equivalent of branch banking. One of the major purposes of the BHCA was to eliminate this loophole. H. R. Rep. No. 609, 84th Cong., 1st Sess., 2–6 (1955); 101 Cong. Rec. 4407 (1955) (remarks of Rep. Wier); *id.*, at 8028–8029 (remarks of Rep. Patman); 102 Cong. Rec. 6858–6859 (1956) (remarks of Sen. Douglas). As enacted by the House in 1955, the BHCA contained a flat ban on interstate bank acquisitions. The legislative history from the House makes it clear that the policies of community control and local responsiveness of banks inspired this flat ban. See 101 Cong. Rec. A2454 (1955) (remarks of Rep. Wier); *id.*, at 8030–8031 (remarks of Rep. Rains); H. R. Rep. No. 609, *supra*, at 2–6.

The Douglas Amendment was added on the floor of the Senate. Its entire legislative history is confined to the Senate debate. In such circumstances, the comments of individ-

170

ual legislators carry substantial weight, especially when they reflect a consensus as to the meaning and objectives of the proposed legislation though not necessarily the wisdom of that legislation. The instant case is not a situation where the comments of an individual legislator, even a sponsor, is at odds with the language of the statute or other traditionally more authoritative indicators of legislative intent such as the conference or committee reports.

The bill reported out by the Senate Committee on Banking and Currency permitted interstate bank acquisitions conditioned only on approval by the Federal Reserve Board. This approach apparently was favored by many of the large bank holding companies which sought further expansion, see, e. g., Control of Bank Holding Companies, 1955: Hearings on S. 880 et al. before the Subcommittee of the Senate Committee on Banking and Currency, 84th Cong., 1st Sess., 132, 136 (1955) (testimony of Ellwood Jenkins, First Bank Stock Corp.), 298–299 (Baldwin Maull, Marine Midland Corp.), 320 (Cameron Thomson, Northwest Bancorporation), cf. 375, 385 (Frank N. Belgrano, Jr., Transamerica Corp.), and by some who thought the total ban in the House bill offensive to States' rights, see 102 Cong. Rec. 6752 (1956) (remarks of Sen. Robertson, floor manager of Committee bill, quoting Sen. Maybank).

The Douglas Amendment was a compromise between the two extremes that also accommodated the States' rights concern:

> "Our amendment would prohibit bank holding companies from purchasing banks in other States unless such purchases by out-of-State holding companies were specifically permitted by law in such States." *Id.*, at 6860 (remarks of Sen. Douglas).

Accord, *ibid.* (remarks of Sen. Bennett in opposition to the Amendment).

Of central concern to this litigation, the Douglas compromise did not simply leave to each State a choice one way or

the other—either to permit or bar interstate acquisitions of local banks—but to allow each State flexibility in its approach. Senator Douglas explained that under his amendment bank holding companies would be permitted to acquire banks in other States "only to the degree that State laws expressly permit them." *Id.*, at 6858. Petitioners contend that by the phrase "to the degree" Senator Douglas intended merely a quantitative reference to the number of States which might lift the ban, and did not mean that a State could partially lift the ban. Petitioners' contention, however, is refuted by the close analogy drawn by Senator Douglas between his amendment and the McFadden Act, 12 U. S. C. § 36(c):

> "The organization of branch banks proceeded very rapidly in the 1920's, and to check their growth various States passed laws limiting, and in some cases preventing it, as in the case of Illinois. National banks had previously been implicitly prohibited from opening branches, and there was a strong movement to remove this prohibition and completely open up the field for the national banks. This, however, was not done. Instead, by the McFadden Act and other measures, national banks have been permitted to open branches only to the degree permitted by State laws and State authorities.
>
> "I may say that what our amendment aims to do is to carry over into the field of holding companies the same provisions which already apply for branch banking under the McFadden Act—namely, our amendment will permit out-of-State holding companies to acquire banks in other States only to the degree that State laws expressly permit them; and that is the provision of the McFadden Act." *Ibid.*

See *id.*, at 6860.

In enacting the McFadden Act in 1927, Congress relaxed federal restrictions on branch banking by national banks, but at the same time subjected them to the same branching

restrictions imposed by the States on state banks. *First National Bank* v. *Walker Bank & Trust Co.*, 385 U. S. 252, 258 (1966). Congress intended "to leave the question of the desirability of branch banking up to the States," *ibid.*, and to permit branch banking by national banks " 'in only those States the laws of which permit branch banking, and only to the extent that the State laws permit branch banking.' " *Id.*, at 259 (quoting Sen. Glass, 76 Cong. Rec. 2511 (1933)). The McFadden Act did not offer the States an all-or-nothing choice with respect to branch banking. As Senator Douglas observed, some States had *limited* intrastate branching by state banks, and others like Illinois had *prohibited* it altogether.

This variative approach to intrastate branching was nicely illustrated at the time by the structure in New York, which Senator Douglas described as follows: "In New York the State is divided into 10 zones. Branch banking is permitted within each of the zones, but a bank cannot have branches in another zone." 102 Cong. Rec. 6858 (1956). At the same time, Pennsylvania permitted branching in contiguous counties. *Upper Darby National Bank* v. *Myers*, 386 Pa. 12, 124 A. 2d 116 (1956). In view of this analogy to the McFadden Act and Senator Douglas' explanation of that Act, there can be no other conclusion but that Congress contemplated that some States might partially lift the ban on interstate banking without opening themselves up to interstate banking from everywhere in the Nation.

Not only are the Massachusetts and Connecticut statutes consistent with the Douglas Amendment's anticipation of differing approaches to interstate banking, but they are also consistent with the broader purposes underlying the BHCA as a whole and the Douglas Amendment in particular to retain local, community-based control over banking. Faced with growing competition from nonbank financial services that are not confined within state lines, these States sought an alternative that allowed expansion and growth of local

banks without opening their borders to unimpeded interstate banking. The Connecticut General Assembly established a Commission in 1979 to study the problem. It concluded:

"Both at the national and state levels the philosophy underlying our structure of bank regulation has been to promote a pluralistic banking system—a system comprised of many units, rather than a highly concentrated system made up of a few large banks. The promotion of local ownership and control of banks has as one of its objectives the preservation of a close relationship between those in our communities who need credit and those who provide credit. To allow the control of credit that is essential for the health of our state economy to pass to hands that are not immediately responsive to the interests of Connecticut citizens and businesses would not, we believe, serve our state well. Similarly, to expose our smaller banks to the rigors of unlimited competition from large out-of-state banking organizations—particularly at a time when deregulation of banking products at the federal level is already putting strains on the resources of smaller banks—would not be wise." Report to the General Assembly of the State of Connecticut (Jan. 5, 1983), 4 App. in No. 84–4047 (CA2), pp. 1230, 1240–1241.

Rather, the Commission proposed "an experiment in regional banking" as a first step toward full interstate banking which "would afford the legislature an opportunity to make its own calculus of the benefits and detriments that might result from a broader program of interstate banking." *Id.*, at 1241–1242. The Connecticut General Assembly adopted the Commission's recommendations, and we believe that Connecticut's approach is precisely what was contemplated by Congress when it adopted the Douglas Amendment.

We hold that the Connecticut and Massachusetts statutes are of the kind contemplated by the Douglas Amendment to lift its bar against interstate acquisitions.

174

*Commerce Clause*

Petitioners contend that the regional limitation in the Massachusetts and Connecticut statutes burdens commerce from without the region while permitting a free flow of commerce among the States within the region. They provide numerous citations to prove that one of the principal purposes of the Framers of the Constitution was to break up and forestall precisely this type of economic "Balkanization" into confederations of States to the detriment of the welfare of the Union as a whole. See, *e. g., H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 533 (1949); *Hughes* v. *Oklahoma,* 441 U. S. 322, 325–326 (1979); The Federalist Nos. 7 and 22, pp. 62–63, 143–145 (Rossiter ed. 1961). There can be little dispute that the dormant Commerce Clause would prohibit a group of States from establishing a system of regional banking by excluding bank holding companies from outside the region if Congress had remained completely silent on the subject. *Lewis* v. *BT Investment Managers, Inc.,* 447 U. S. 27, 39–44 (1980). Nor can there be serious question that an individual State acting entirely on its own authority would run afoul of the dormant Commerce Clause if it sought to comprehensively regulate acquisitions of local banks by out-of-state holding companies. *Sporhase* v. *Nebraska ex rel. Douglas,* 458 U. S. 941 (1982).

But that is not our case. Here the commerce power of Congress is not dormant, but has been exercised by that body when it enacted the Bank Holding Company Act and the Douglas amendment to the Act. Congress has authorized by the latter amendment the Massachusetts and Connecticut statutes which petitioners challenge as violative of the Commerce Clause. When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause. *Western & Southern Life Insurance Co.* v. *State Board of Equalization,* 451 U. S. 648, 653–654 (1981); *White* v. *Massachusetts Council of Construction Employers, Inc.,* 460 U. S. 204 (1983); cf. *South-Central Timber Development, Inc.* v. *Wunnicke,*

467 U. S. 82 (1984). Petitioners' Commerce Clause attack on the challenged acquisitions therefore fails.

## Compact Clause

Petitioners maintain that the Massachusetts and Connecticut statutes constitute a compact to exclude non-New England banking organizations which violates the Compact Clause, U. S. Const., Art. I, § 10, cl. 3, because Congress has not specifically approved it. We have some doubt as to whether there is an agreement amounting to a compact. The two statutes are similar in that they both require reciprocity and impose a regional limitation, both legislatures favor the establishment of regional banking in New England, and there is evidence of cooperation among legislators, officials, bankers, and others in the two States in studying the idea and lobbying for the statutes. But several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. Most importantly, neither statute requires a reciprocation of the regional limitation. Bank holding companies based in Maine, which has no regional limitation, and Rhode Island, which will drop the regional limitation in 1986, are permitted by the two statutes to acquire Massachusetts and Connecticut banks. These two States are included in the ostensible compact under petitioners' theory, yet one does not impose the exclusion to which petitioners so strenuously object and the other plans to drop it after two years.

But even if we were to assume that these state actions constitute an agreement or compact, not every such agreement violates the Compact Clause. *Virginia* v. *Tennessee,* 148 U. S. 503 (1893).

"The application of the Compact Clause is limited to agreements that are 'directed to the formation of any combination tending to the increase of political power in

the States, which may encroach upon or interfere with the just supremacy of the United States.'" *New Hampshire* v. *Maine,* 426 U. S. 363, 369 (1976), quoting *Virginia* v. *Tennessee, supra,* at 519.

See *United States Steel Corp.* v. *Multistate Tax Comm'n,* 434 U. S. 452, 471 (1978).

In view of the Douglas Amendment to the BHCA, the challenged state statutes which comply with that Act cannot possibly infringe federal supremacy. To the extent that the state statutes might conflict in a particular situation with other federal statutes, such as the provision under which the Federal Deposit Insurance Corporation will arrange for the acquisition of failing banks by out-of-state bank holding companies, 12 U. S. C. § 1823(f), they would be pre-empted by those statutes, and therefore any Compact Clause argument would be academic. Petitioners also assert that the alleged regional compact impermissibly offends the sovereignty of sister States outside of New England. We do not see how the statutes in question either enhance the *political* power of the New England States at the expense of other States or have an "impact on our federal structure." *United States Steel Corp.* v. *Multistate Tax Comm'n, supra,* at 471, 473.

## Equal Protection Clause

Petitioners argued before the Board and the Court of Appeals that the Massachusetts and Connecticut statutes violated the Equal Protection Clause, U. S. Const., Amdt. 14, § 2, by excluding bank holding companies from some States while admitting those from others. This claim was abandoned in their petition for certiorari and their briefs on the merits, but after our decision in *Metropolitan Life Insurance Co.* v. *Ward,* 470 U. S. 869 (1985), petitioners filed a supplemental brief urging us to consider the equal protection issue. Because the issue was fully reviewed by the Board and the Court of Appeals and because it would undoubtedly

cloud other pending applications for acquisitions by bank holding companies, we elect to decide it.

In *Metropolitan Life* we held that encouraging the formation of new domestic insurance companies within a State and encouraging capital investment in the State's assets and governmental securities were not, standing alone, legitimate state purposes which could permissibly be furthered by discriminating against out-of-state corporations in favor of local corporations.   There we said:

> "This case does not involve or question, as the dissent suggests, *post*, at 900–901, the broad authority of a State to promote and regulate its own economy.   We hold only that such regulation may not be accomplished by imposing discriminatorily higher taxes on nonresident corporations solely because they are nonresidents."   *Id.*, at 882, n. 10.

Here the States in question—Massachusetts and Connecticut—are not favoring local corporations at the expense of out-of-state corporations.   They are favoring out-of-state corporations domiciled within the New England region over out-of-state corporations from other parts of the country, and to this extent their laws may be said to "discriminate" against the latter.   But with respect to the business of banking, we do not write on a clean slate; recently in *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S., at 38, we said that "banking and related financial activities are of profound local concern."   This statement is a recognition of the historical fact that our country traditionally has favored widely dispersed control of banking.   While many other western nations are dominated by a handful of centralized banks, we have some 15,000 commercial banks attached to a greater or lesser degree to the communities in which they are located. The Connecticut legislative Commission that recommended adoption of the Connecticut statute in question considered

interstate banking on a regional basis to combine the beneficial effect of increasing the number of banking competitors with the need to preserve a close relationship between those in the community who need credit and those who provide credit. 4 App. in No. 84–4047 (CA2), pp. 1239–1241. The debates in the Connecticut Legislature preceding the enactment of the Connecticut law evince concern that immediate acquisition of Connecticut banks by holding companies headquartered outside the New England region would threaten the independence of local banking institutions. See, *e. g.*, App. to Pet. for Cert. A157–A160. No doubt similar concerns motivated the Massachusetts Legislature.

We think that the concerns which spurred Massachusetts and Connecticut to enact the statutes here challenged, different as they are from those which motivated the enactment of the Alabama statute in *Metropolitan*, meet the traditional rational basis for judging equal protection claims under the Fourteenth Amendment. *Barry* v. *Barchi*, 443 U. S. 55, 67 (1979); *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979).

We hold that the state statutes here in question comply with the Douglas Amendment and that they do not violate the Commerce Clause, the Compact Clause, or the Equal Protection Clause of the United States Constitution. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE O'CONNOR, concurring.

I agree that the state banking statutes at issue here do not violate the Commerce Clause, the Compact Clause, or the Equal Protection Clause. I write separately to note that I see no meaningful distinction for Equal Protection Clause purposes between the Massachusetts and Connecticut statutes we uphold today and the Alabama statute at issue in *Metropolitan Life Insurance Co.* v. *Ward*, 470 U. S. 869 (1985).

The Court distinguishes this case from *Metropolitan Life* on the ground that Massachusetts and Connecticut favor neighboring out-of-state banks over all other out-of-state banks. It is not clear to me why completely barring the banks of 44 States from doing business is less discriminatory than Alabama's scheme of taxing the insurance companies from 49 States at a slightly higher rate. Nor is it clear why the Equal Protection Clause should tolerate a regional "home team" when it condemns a state "home team." See *id.*, at 878.

The Court emphasizes that here we do not write on a clean slate as the business of banking is "of profound local concern." *Ante,* at 177. The business of insurance is also of uniquely local concern. *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408, 415–417 (1946). Both industries historically have been regulated by the States in recognition of the critical part they play in securing the financial well-being of local citizens and businesses. *Metropolitan Life Insurance Co.* v. *Ward, supra,* at 888–893 (dissenting opinion). States have regulated insurance since 1851. Like the local nature of banking, the local nature of insurance is firmly ensconced in federal law. 470 U. S., at 888–889. The McCarran-Ferguson Act, enacted in 1945, states:

> "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 59 Stat. 33, 15 U. S. C. § 1011.

The Court distinguishes the Connecticut and Massachusetts banking laws as having a valid purpose: "to preserve a close relationship between those in the community who need credit and those who provide credit." *Ante,* at 178. This interest in preserving local institutions responsive to local concerns was a cornerstone in Alabama's defense of its insur-

ance tax. It survives as one of the "15 additional purposes" the Court remanded for reconsideration. *Metropolitan Life Insurance Co.* v. *Ward, supra,* at 875–876, n. 5.

Especially where Congress has sanctioned the barriers to commerce that fostering of local industries might engender, this Court has no authority under the Equal Protection Clause to invalidate classifications designed to encourage local businesses because of their special contributions. Today's opinion is consistent with the longstanding doctrine that the Equal Protection Clause permits economic regulation that distinguishes between groups that *are* legitimately different—as local institutions so often are—in ways relevant to the proper goals of the State.