#27931, #27936-a-GAS
2017 S.D. 22

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

AMBER MAURICIO and
SHELLI GRINAGER,                                     Plaintiffs and Appellants,


        v.


DENNIS DAUGAARD, in his official
capacity as the Governor of the State
of South Dakota, and THE STATE OF
SOUTH DAKOTA, and DR. MELODY SCHOPP,
in her official capacity as the Secretary
of the South Dakota Department of Education,
and RICHARD SATTGAST, in his official capacity
as South Dakota State Treasurer, and SOUTH
DAKOTA DEPARTMENT OF EDUCATION, and
SOUTH DAKOTA BOARD OF EDUCATION,
and OFFICE OF THE STATE TREASURER
OF SOUTH DAKOTA,                                     Defendants and Appellees.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA
* * * *
THE HONORABLE MARK BARNETT
Judge
* * * *

KATE OLIVERI of
Thomas More Law Center
Ann Arbor, Michigan

and

ROBERT J. ROHL of
Johnson Eiesland Law Offices, PC
Rapid City, South Dakota                            Attorneys for plaintiffs and
                                                    appellants.



* * * *

ARGUED FEBRUARY 14, 2017
OPINION FILED 05/03/17

MARTY J. JACKLEY
Attorney General

RICHARD M. WILLIAMS
Deputy Attorney General
Pierre, South Dakota

HOLLY FARRIS
Special Assistant Attorney General
Department of Education
Pierre, South Dakota

Attorneys for defendants and appellees.

#27931, #27936

SEVERSON, Justice

[¶1.]     Amber Mauricio and Shelli Grinager filed a complaint seeking declaratory and injunctive relief.  They asked the circuit court to declare that an educational consortium, the Smarter Balanced Assessment Consortium, to which the State is a member, is in violation of the United States Constitution and thus illegal and void.  They sought a permanent injunction to prevent the State from disbursing funds to SBAC.  Plaintiffs also alleged in their complaint that the State is administering educational assessments in violation of South Dakota law.  Plaintiffs and the State sought summary judgment.  The circuit court granted summary judgment in favor of the State.  Plaintiffs appeal, and the State has filed a notice of review.  We affirm.

## Background

[¶2.]     In 2009, the National Governors Association and the Council of Chief State School Officers initiated an effort to develop a national, uniform set of standards in English language arts and mathematics for grades K-12, referred to as the Common Core State Standards.  In February 2009, Congress passed the American Recovery and Reinvestment Act of 2009 (ARRA).  Pub. L. No. 111-5, 123 Stat. 115.  As part of ARRA, Congress authorized educational incentive grants to be administered by the Secretary of the Department of Education.  *See* 20 U.S.C. § 10006 (2012).  States seeking grants under ARRA needed to submit an application that included an assurance that the state "(A) will enhance the quality of the academic assessments it administers . . . [and] (C) will take steps to improve State academic content standards and student academic achievement standards

-1-

consistent with section 9871 (e)(1)(A)(ii) of [Title 20]." 20 U.S.C. § 10005(d)(4)(2012).

[¶3.] In November of 2009, the Department of Education (DOE) introduced the Race to the Top Fund, which invited states to apply for grants authorized under ARRA. The DOE would select recipients of funds based on enumerated criteria, which included a state's "commitment to adopting a common set of high-quality standards . . . [and] to improving the quality of its assessments[.]" Race to the Top Fund; Notice Inviting Applications for New Award for Fiscal Year (FY) 2010, 74 Fed. Reg. 59,836, 59,843 (Nov. 18, 2009). A state could demonstrate its commitment by participating in a consortium of states working "toward jointly developing and adopting a common set of K-12 standards" and "developing and implementing common, high-quality assessments . . . aligned with the consortium's common set of K-12 standards[.]" *Id.*

[¶4.] In April 2010, DOE announced that it would provide "funding to consortia of States to develop assessments that are valid, support and inform instruction, provide accurate information about what students know and can do, and measure student achievement against standards designed to ensure that all students gain the knowledge and skills needed to succeed in college and the workplace." Race to the Top Fund Assessment Program; Notice Inviting Applications for New Awards for Fiscal Year (FY) 2010, 75 Fed. Reg. 18,171, (Apr. 9, 2010). To be eligible for a grant, a consortium of states would need to include "at least 15 States, of which at least 5 States must be governing States[.]" *Id.* Each state in the consortium needed to submit an assurance that, "to remain in the

consortium, the State will adopt a common set of college- and career-ready standards . . . no later than December 31, 2011, and common achievement standards . . . no later than the 2014-2015 school year." *Id.* at 18,174.

[¶5.]　　　Two consortiums were formed to take advantage of the assessment funding. One was the Smarter Balanced Assessment Consortium (SBAC), and the other was the Partnership for Assessment of Readiness for College and Careers. The SBAC grant application explained that SBAC would develop a uniform "multi-state assessment system based on the Common Core State Standards." The DOE awarded a grant of approximately $159 million in Race to the Top Funds to SBAC and awarded over $15 million to help participating states successfully transition to common standards and assessments.

[¶6.]　　　In 2010, South Dakota executed a memorandum of understanding, joining SBAC and becoming an advisory state. South Dakota subsequently became a governing state member.[1] It agreed to implement statewide, SBAC's summative assessment in mathematics and English language arts for grades three through eight and high school no later than the 2014-2015 school year. It also agreed to adhere to the governance of SBAC; to support SBAC's decisions; follow agreed-upon timelines; to be willing to participate in the decision-making process and final decisions; and to identify and implement a plan to address barriers in state law, statute, regulation, or policy to implementing SBAC's proposed assessment system.

---

1.　　The Governor asked that South Dakota become a governing state in 2011, after the State had adopted Common Core.

[¶7.]        SBAC's federal funding from the grant ended in late 2014. SBAC subsequently moved its operations to the University of California, Los Angeles (UCLA). Since July 1, 2014, SBAC has operated in coordination with UCLA's Graduate School of Education and Information Studies and its National Center for Research on Evaluation, Standards and Student Testing. In late 2014, South Dakota's Secretary of the Department of Education entered into a new Memorandum of Understanding and Agreement (MOUA) with the Regents of the University of California (UC). The 2014 MOUA is the subject of this lawsuit. In the MOUA, the State agreed to continue participation in SBAC. It also agreed to participate in SBAC's governing board and to be bound by SBAC's governing board procedures and "all other decisions and actions" of the governing board that were intended to bind SBAC's members. The MOUA established an annual fee. The State's fee for 2014-2015 was $680,628.50.

[¶8.]        In November 2015, Plaintiffs, Amber Mauricio and Shelli Grinager, filed a complaint seeking declaratory and injunctive relief against the State. They alleged that SBAC constitutes an interstate compact in violation of the Compact Clause of the United States Constitution, Article I, Section 10, Clause 3, which requires congressional approval of certain interstate agreements and compacts. It is undisputed that SBAC was not submitted for congressional approval. They also asserted that SBAC assessments violate SDCL 13-3-55, which requires, in part, that "[e]very public school district shall annually administer the same assessment to all students in grades three to eight, inclusive, and in grade eleven. The assessment shall measure the academic progress of each student." Because the

SBAC assessments are computer adaptive, Plaintiffs maintained that SBAC assessments are different every time that a student takes one.

[¶9.]    The State filed a motion to dismiss the complaint, and in subsequent briefing, the State requested that, if the court were to consider documents outside of the pleadings, the court treat the State's motion to dismiss as a summary judgment motion under SDCL 15-6-12(b). Plaintiffs also sought summary judgment. The circuit court held a hearing on April 4, 2016, and issued a memorandum decision on June 13, 2016. The court denied the State's motion to dismiss and Plaintiffs' motion for summary judgment. It granted summary judgment in favor of the State. The court concluded that SBAC constitutes an interstate compact that does not need congressional approval. It also determined that SBAC assessments did not violate SDCL 13-3-55. Plaintiffs allege that both determinations are erroneous. According to Plaintiffs, the member states must obtain congressional approval of SBAC. Through notice of review, the State alleges that the court erred by determining that an interstate compact exists.

## Standard of Review

[¶10.]    "We review a circuit court's grant of summary judgment to determine whether genuine issues of material fact exist and whether the law was applied correctly. 'When the material facts are undisputed, this Court's review is limited to determining whether the trial court correctly applied the law.'" *W. Nat. Mut. Ins. Co. v. Gateway Bldg. Sys., Inc.*, 2016 S.D. 85, ¶ 7, 887 N.W.2d 887, 890 (quoting *Swenson v. Auto Owners Ins. Co.*, 2013 S.D. 38, ¶ 12, 831 N.W.2d 402, 407).

## Analysis

### *Whether the consortium constitutes an interstate agreement or compact requiring congressional approval.*

[¶11.]     The Compact Clause of the United States Constitution, Article I, Section 10, Clause 3, provides:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

As early as 1893, the United States Supreme Court addressed the clause, determining that "[l]ooking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States." *Virginia v. Tennessee*, 148 U.S. 503, 519, 13 S. Ct. 728, 734, 37 L. Ed. 537 (1893).  The Court specifically adopted that rule in *New Hampshire v. Maine,* 426 U.S. 363, 369, 96 S. Ct. 2113, 2117, 48 L. Ed. 2d 701 (1976), and again in *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 471, 98 S. Ct. 799, 812, 54 L. Ed. 2d 682 (1978).  It explained that "[t]his rule states the proper balance between federal and state power with respect to compacts and agreements among States." *U.S. Steel Corp.*, 434 U.S. at 471, 98 S. Ct. at 812.  And the Court has declined a relatively recent invitation to read the Compact Clause literally.  *See id.* at 460, 98 S. Ct. at 806 ("At this late date, we are reluctant to accept this invitation to circumscribe modes of interstate cooperation that do not enhance state power to the detriment of federal supremacy.").

[¶12.]        First, we consider whether the State entered into an arrangement that amounts to an agreement or compact between states. The State's notice of review contends that the circuit court erred by concluding that SBAC is a compact. According to the State, SBAC lacks "classic indicia of a compact[,]" as first discussed by the United States Supreme Court in *Northeast Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 175, 105 S. Ct. 2545, 2554, 86 L. Ed. 2d 112 (1985). In *Northeast Bancorp*, the Court addressed state statutes regarding interstate bank acquisitions. *Id.* at 163-64, 105 S. Ct. at 2548. Massachusetts and Connecticut enacted statutes that only allowed out-of-state bank holding companies to acquire local banks if the out-of-state company had its principal place of business in another New England state. *Id.* at 164, 105 S. Ct. at 2548-49. The Petitioners in *Northeast Bancorp* challenged the regionally-restrictive statutes. *Id.* at 166, 105 S. Ct. at 2549. They alleged, among other things, that the statutes amounted to a compact in violation of the Compact Clause. *Id.* The Court examined the statutes and expressed doubt over whether the statutes amounted to a compact. It stated:

> We have some doubt as to whether there is an agreement amounting to a compact. The two statutes are similar in that they both require reciprocity and impose a regional limitation, both legislatures favor the establishment of regional banking in New England, and there is evidence of cooperation among legislators, officials, bankers, and others in the two States in studying the idea and lobbying for the statutes. But several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. Most importantly, neither statute requires a reciprocation of the regional limitation. Bank holding companies based in Maine, which has no regional limitation, and Rhode Island, which will drop the regional limitation in 1986, are permitted by the two statutes to acquire

-7-

Massachusetts and Connecticut banks. These two States are included in the ostensible compact under petitioners' theory, yet one does not impose the exclusion to which petitioners so strenuously object and the other plans to drop it after two years.

*Id.* at 175, 105 S. Ct. at 2554. The Court did not definitively determine whether the statutes amounted to an agreement or compact. Instead, the Court determined that "even if [it] were to assume that these state actions constitute an agreement or compact, not every such agreement violates the Compact Clause." *Id.* It upheld the reciprocal statutes because they did not encroach or interfere with the just supremacy of the United States. *Id.*

[¶13.]    In this case, the State emphasizes that each individual state enters into a separate memorandum of understanding with UC; this is not an agreement between states collectively. In addition, the State points out the following: SBAC creates assessments that each state would have the power to create on its own; the MOUA does not dictate state educational policy; no multistate function is regulated; implementation of assessments is not conditioned on the action of any other state; a state may modify or repeal its own laws unilaterally to divest itself of the obligations imposed by the MOUA; and no state is required to contract with UC for assessment tools.

[¶14.]    On the other hand, citing to case law explaining that UC is a corporation created by the California Constitution and an arm of the State of California, Plaintiffs maintain that, at the very least, the MOUA constitutes an agreement between South Dakota and California. *See Armstrong v. Meyers*, 964 F.2d 948, 949 (9th Cir. 1992). Furthermore, they contend that SBAC imposes limitations on the State's ability to withdraw, allows states to exercise powers that

they could not exercise individually, involves delegation of sovereign power, and has an independent governance structure. Moreover, the MOUA entered into by South Dakota specifically contemplates participation in SBAC by other states. "Members" is defined in the MOUA as "collectively, every state, commonwealth or United States territory that enters into a memorandum of understanding and agreement with UC for participation in SB [Smarter Balanced], as well as any other entities that the Governing Board determined to provide with voting rights in SB equal to the rights enjoyed by Member under this MOU."

[¶15.]		Similar to the United States Supreme Court in *Northeast Bancorp.*, we have doubts as to whether this arrangement amounts to an interstate agreement. "But even if we were to assume that these state actions constitute an agreement or compact, not every such agreement violates the Compact Clause." *Northeast Bancorp, Inc.*, 472 U.S. at 175, 105 S. Ct. at 2554. "The relevant inquiry must be one of impact on our federal structure." *U.S. Steel Corp.*, 434 U.S. at 471, 98 S. Ct. at 811. "[T]he test is whether the Compact enhances state power *quoad* the National Government." *Id.* at 473, 98 S. Ct. at 812-13.

[¶16.]		Accordingly, assuming without deciding that the MOUA amounts to an interstate compact, we turn to the issue whether it enhances state power *quoad* the National Government. Plaintiffs maintain that SBAC threatens the supremacy of the federal government because it undermines a congressional policy against nationalized educational standards and federal statutes forbidding the DOE to implement national curriculum. *See* 20 U.S.C § 1232a (2012) (prohibiting

provisions from being construed to allow federal control of education)[2]; 20 U.S.C. §

3403(a)-(b)(2012)[3] (recognizing that the responsibility for education is reserved to

the states and prohibiting the DOE from construing other provisions as authorizing

DOE to exercise certain educational control over the states). Plaintiffs overstate the

federal provisions they cite, which only deal with limitations on the federal

government, not state actions. Contrary to what their argument may suggest,

Congress has not prohibited national or regional efforts to administer the same or

similar educational plans. Instead, Congress has recognized that it does not have

the authority to directly control educational systems in the states. Education is a

matter reserved to the states. *See* 20 U.S.C. § 3401(4) ("[I]n our Federal system, the

---

2.    20 U.S.C. § 1232a provides:

> No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system, or to require the assignment or transportation of students or teachers in order to overcome racial imbalance.

3.    20 U.S.C. § 3403 (b) provides:

> No provision of a program administered by the Secretary or by any other officer of the Department shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law.

-10-

primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States[.]"); *Brown v. Bd. of Ed.*, 347 U.S. 483, 493, 74 S. Ct. 686, 691, 98 L. Ed. 873 (1954)("Today, education is perhaps the most important function of state and local governments."). Congress has made it clear that the DOE has no authority to nationalize curricula.[4] But it has not banned efforts by the states to regionalize or nationalize certain aspects of educational policy; nor could it.

[¶17.] Even Plaintiffs admit that educational policy is a sovereign power of the state. In order to determine that Congress must approve or disapprove of SBAC, Plaintiffs would need to identify federal authority in this area, which they have not done. Allowing Congress to determine this issue would be granting the federal government expanded power by giving it authority over administrative educational decisions, in direct contravention of the power reserved to the states in the Tenth Amendment of the United States Constitution. U.S. Const. amend. X. Although SBAC no longer receives federal funds, there is no question that the federal government can incentivize, to a degree, certain educational goals. However, the federal government does not have the authority to prohibit the states from working together to create educational assessments geared towards the content standards that each state has independently decided to adopt. Accordingly, there is no impact, actual or potential, on federal supremacy resulting from the

---

4. Included within Plaintiffs' argument of circumvention of congressional policy is their argument that DOE has coerced states into adopting national education standards. As the circuit court noted, we have no jurisdiction to pass judgment on the actions of DOE; it is not a party to this lawsuit.

states working together to create certain curricula or assessments. *See U.S. Steel Corp.*, 434 U.S. at 472, 98 S. Ct. at 812 (holding that the inquiry is one of potential, rather than actual impact upon federal supremacy).

[¶18.]	Next, Plaintiffs maintain that SBAC's existence threatens the sovereignty of its member states because it binds states to educational policy decisions of SBAC's governing board and executive committee. Plaintiffs contend that interstate compacts that threaten the sovereignty of member states or non-member states also require congressional approval. Plaintiffs simultaneously assert that SBAC also enhances state power beyond what each state could exercise individually. According to Plaintiffs, SBAC allows governing members to dictate the educational decisions of non-governing members. Although the United States Supreme Court has considered in dicta arguments concerning the effect that a compact may have on the sovereignty of member and non-member states, it is unclear how those issues relate to the test that the Court has established, which considers whether state power is enhanced "at the expense of federal supremacy." *See U.S. Steel Corp.*, 434 U.S. at 472, 477, 98 S. Ct. at 813, 815 (considering whether there was a delegation of sovereign power under the Multistate Tax Compact).

[¶19.]	Nevertheless, we note that the Governing Board is not concerned with dictating educational policy. According to the terms of the MOUA, "[t]he Governing Board will provide direction and oversight *with respect to Products and Services*[5]

---

5.	The MOUA, in paragraph 1.21, states that:

(continued . . .)

*to be provided* by SB to the Members. The Governing Board will be responsible for approving the Planning Documents[6] annually and otherwise as required by this MOU or by the Governing Board Procedures." MOUA paragraph 3.1 (defining the "Role of Governing Board Generally") (emphasis added). A review of Exhibit B to the MOUA, which lists the "Products and Services" available to a member for the fiscal year 2014-2015, confirms that SBAC is providing assessment packages and relevant services such as project management and technical support.

[¶20.] Accordingly, SBAC is not concerned with dictating educational policies. Instead, it is concerned with developing and providing assessments to measure student performance and developing relevant tools and services necessary to administer those assessments. It is important to note, as the circuit court did, that

---

(. . . continued)

  'Products and Services' means, those products and services that Member obtains from UC pursuant to this MOU, which will include (without limitation): general operational support; assessment and item design; interoperability and certification assistance; applications development and maintenance pursuant to agreed upon milestones and service levels; access to and use of the SB Website; reporting services; and, to the extent included in or otherwise relevant to the foregoing, the Consortium Assets, the SB Materials, and the UC Materials. The specific Products and Services available to Member at the Effective Date are set forth in Exhibit B. The Products and Services are subject to change from time to time as set forth in Section 5.5(a) below. Section 5.5(a) also sets forth the process by which Member will identify Products and Services for purchase under this MOU.

6.  The MOUA, in paragraph 1.20, states that "'Planning Documents' means, with respect to SB, the annual budget (including Annual Operating Expenses for each fiscal year), staffing plans, project schedules, descriptions of Products and Services to be offered to Members, and such other planning and management documentation as the Governing Board determines for each fiscal year."

South Dakota was not forced by SBAC to adopt Common Core State Standards. It chose to do so and entered into a contract to ease the financial burden of developing assessments aligned with those educational goals. The same thing can be said for other member states. Each state has the power to contract with a provider of assessments. By participating in SBAC, the member states have eased the financial burden of meeting their assessment needs. As the United States Supreme Court has stated:

> The Constitution did not purport to exhaust imagination and resourcefulness in devising fruitful interstate relationships. It is not to be construed to limit the variety of arrangements which are possible through the voluntary and cooperative actions of individual States with a view to increasing harmony within the federalism created by the Constitution.

*U.S. Steel Corp.*, 434 U.S. at 470, 98 S. Ct. at 811.

[¶21.]     Due to the above factors, SBAC is not a compact or agreement that requires the consent of Congress. It does not enhance the states' power *quoad* the national government. South Dakota, along with other states, decided to implement Common Core State Standards and properly entered into an agreement to develop assessments with respect to those standards.

### *Whether SBAC assessments violate SDCL 13-3-55.*

[¶22.]     Finally, Plaintiffs assert that the SBAC assessments are in violation of South Dakota law due to their computer-adaptive nature. SDCL 13-3-55 provides:

> Every public school district shall annually administer the same assessment to all students in grades three to eight, inclusive, and in grade eleven. The assessment shall measure the academic progress of each student. Every public school district shall annually administer to all students in at least two grade levels an achievement test to assess writing skills. The assessment instruments shall be provided by the Department of

> Education, and the department shall determine the two grade levels to be tested. The tests shall be administered within timelines established by the Department of Education by rules promulgated pursuant to chapter 1-26 starting in the spring of the 2002-2003 school year. Each state-designed test shall be correlated with the state's content standards. The South Dakota Board of Education may promulgate rules pursuant to chapter 1-26 to provide for administration of all assessments.

According to Plaintiffs, *same assessment* means that every student must receive the *same test*. The assessment adjusts the difficulty of questions as a student progresses in the assessment. Students who correctly answer a question will then receive a more challenging question while those who answer incorrectly will receive an easier question. Plaintiffs note that *assessment* is a synonym of *test* and cite to a dictionary definition of *test* defining it as "an examination to determine factual knowledge or mental proficiency esp. given to students during the course of a school term and covering a limited part of the year's work." *Webster's Third New International Dictionary* 131 (2002). They also provide us with definitions of *same* which include "resembling in every way" and "conforming in every respect." *Id.* at 2007. According to Plaintiffs, SBAC clearly fails to satisfy this requirement because of the tailored set of questions that each student receives. This, Plaintiffs state, prevents direct comparisons of an individual student's result with his or her peers, and thus circumvents the "fairness in student assessments." The State asserts that reading the statute in such a literal way would require that each student, in every grade to be tested, must answer the same questions, *i.e.* third graders must answer the same English and math questions as the eighth graders.

[¶23.] Plaintiffs' reliance on *assessment* and *test* being synonyms is misplaced. They conflate *test* with *questions*. SDCL 13-3-55 does not require that

every student answer identical questions in order to determine his or her academic progress. Even if we only use Plaintiffs' provided dictionary definition of *test*, the assessment clearly meets the requirement. *Test* and *assessment* are broader terms than *questions*. And *same* is also commonly understood to mean "similar in kind, quality, quantity, or degree." *The American Heritage College Dictionary* 1205 (3d ed. 1993). Each student receives an SBAC examination that operates according to an overall blueprint, which specifies the number of and types of questions associated with each section of the assessment. The assessment draws the questions from a bank of potential questions, and each test must meet the requirements of the test blueprint. The assessment is meant to gain a more complete picture of an individual's educational progress. There is little logic behind Plaintiffs' assertion that academic progress can only be measured if all students answer the same questions so that individual results can be compared to that of other students. In such a comparison, all students may fail certain educational benchmarks but one or more students may appear to succeed simply because his or her failure was less severe than other students. If the Legislature wanted to ensure that each student answered identical questions to determine academic progress, it could have defined *assessment* or *test* in such a way.

## Conclusion

[¶24.] Article I, Section 10, Clause 3 of the United States Constitution requires congressional consent of those interstate agreements and compacts that enhance state power at the expense of the just supremacy of the federal government. Regardless of whether SBAC constitutes an interstate agreement or

compact, it does not enhance state power *quoad* the national government and therefore does not need congressional approval. Based on this conclusion we need not decide the State's question on notice of review whether SBAC constitutes an interstate compact. In addition, SBAC assessments do not violate SDCL 13-3-55. Therefore, we affirm the circuit court's grant of summary judgment in favor of the State.

[¶25.] GILBERTSON, Chief Justice, and ZINTER, WILBUR, and KERN, Justices, concur.