**INDEPENDENT COMMUNITY BANKERS ASSOCIATION OF SOUTH DAKOTA, INC., Petitioner,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

**First City Bancorporation of Texas, Inc., Intervenor.**

No. 85–1496.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1986.

Decided June 5, 1987.

---

Ronald G. Schmidt, Pierre, S.D., for petitioner. Leonard J. Ruben also entered an appearance, for petitioner.

James E. Scott, Atty., Board of Governors of the Federal Reserve System, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Richard M. Ashton, Associate General Counsel and Robert D. McGillicuddy, Atty., Bd. of Governors of the Federal Reserve System, Washington, D.C., were on the brief, for respondent.

Platt W. Davis, III, with whom Cathy A. Lewis and James R. Layton, Washington, D.C., were, on the brief, for intervenor.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Independent Community Bankers Association of South Dakota, Inc. ("ICBA") is a trade association representing chartered national and state banks located in South Dakota. It petitions this court to set aside an order of respondent, the Board of Governors of the Federal Reserve System (the "Board"), approving the acquisition of a newly chartered national bank located in South Dakota by First City Bancorporation of Texas, Inc. ("First City"). First City is a Texas corporation and bank holding company that conducts its activities primarily in Texas. It organized and acquired the new national bank to enable it to transfer its consumer credit card business to South Dakota. The fundamental question before this court is whether federal banking law, particularly the Bank Holding Company Act of 1956 ("BHCA"), 12 U.S.C. § 1841 *et seq.* (1982), allows a bank holding company to acquire and operate a limited service national bank located outside the company's home state. Petitioner argues that it does not on two grounds. First, petitioner contends that the BHCA absolutely prohibits the Board from approving the acquisition of a national bank by an out-of-state bank holding company. Petitioner argues, alternatively, that even if the Board may approve such acquisitions generally, it is precluded from approving First City's proposed acquisition because the South Dakota statute authorizing the acquisition places restrictions on the operation of the acquired bank in contravention of federal law governing national banks. We reject petitioner's arguments and deny the petition.

## I. BACKGROUND

In enacting the BHCA, Congress intended, among other things, to prevent overcon-

centration of national financial resources and possible abuses related to control of commercial credit. *See Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 106 S.Ct. 681, 684, 88 L.Ed.2d 691 (1986). To these ends, Congress vested the Board with regulatory authority over the acquisition of state and national banks by bank holding companies. The BHCA defines a bank as any institution organized under state or federal law which "(1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U.S.C. § 1841(c). A bank holding company is defined as any corporation, partnership, business trust, association, or similar organization that owns or controls a bank or another bank holding company. 12 U.S.C. §§ 1841(a)(1), (b). Under section 3 of the BHCA, a bank holding company must obtain approval of the Board before acquiring another bank or substantially all of the assets of another bank. 12 U.S.C. § 1842. Section 3(c) specifies criteria to be considered by the Board in determining whether to grant approval of a proposed acquisition. 12 U.S.C. § 1842(c).

To meet its goals, Congress also chose to rely in part on state regulation of the banking industry. *See Iowa Independent Bankers v. Board of Governors of the Federal Reserve System*, 511 F.2d 1288, 1291 (D.C.Cir.), *cert. denied*, 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975). In section 7 of the BHCA, Congress reserved to each state all powers and jurisdiction in effect before the statute's enactment. *See* 12 U.S.C. § 1846. In addition, and of greater importance to this case, section 3(d) of the BHCA, known as the "Douglas Amendment," prohibits the Board from approving an application of a bank holding company to acquire any additional bank located outside of the state in which the bank holding company principally conducts its operations unless the state specifically authorizes the acquisition by an out-of-

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation

pursuant to 28 U.S.C. § 294(d).

state bank holding company of a state bank located within the state's borders. *See* 12 U.S.C. § 1842(d). Prior to 1956, bank holding companies were permitted to own banks across state lines. Congress, in enacting the Douglas Amendment, expressed its desire to allow each state to choose for itself whether to open its borders to out-of-state banks. *See Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 47, 100 S.Ct. 2009, 2021, 64 L.Ed.2d 702 (1980).

For approximately sixteen years, no state enacted legislation lifting the Douglas Amendment's ban on interstate bank holding company expansion. Beginning in 1972, several states passed statutes permitting interstate bank acquisitions in limited circumstances or for specialized purposes. At present, twenty-eight states and the District of Columbia have adopted some type of "Douglas Amendment" statute. For example, several states have passed "grandfathering" legislation permitting expansion only of existing in-state banking operations by out-of-state bank holding companies. *See, e.g., Iowa Independent Bankers, supra* (sustaining Board approval of two interstate acquisitions under Iowa's grandfathering statute). Another type of statute authorizes out-of-state purchasers to acquire failing local banks. *See, e.g.,* Wash.Rev.Code § 30.04.230(4)(a) (Supp. 1985). By far the most popular kind of Douglas Amendment statute permits the acquisition of in-state banks by out-of-state holding companies located within a defined geographic region, but only on a reciprocal basis. The Supreme Court recently held that the Massachusetts and Connecticut reciprocal acquisition statutes are "of the kind contemplated by the Douglas Amendment to lift its bar against interstate acquisition." *Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. 159, 173, 105 S.Ct. 2545, 2553, 86 L.Ed.2d 112 (1985). The least common kind of statute permits "unrestricted" entry by out-of-state bank holding companies. Finally, ten states have enacted so-called "special purpose" statutes such as the South Dakota statute at issue in this case. Generally, this kind of legislation permits out-of-state organizations to set up in-state banks that do not compete with locally controlled full-service banks. *See id.* at 164, 105 S.Ct. 2548 (noting that Delaware has adopted a special purpose statute).

In 1980, South Dakota enacted legislation designed to permit interstate bank acquisitions. In relevant part, South Dakota's banking law permits out-of-state bank holding companies to acquire "all or substantially all of the shares of a single new bank which is established under the laws of this state ... and a single new national bank which is to be located in this state." S.D. Codified Laws Ann. § 51–16–40(a) (Supp. 1986). The statute limits the operation of such acquired banks to a single banking office. It also requires that the office "be operated in a manner and at a location which is not likely to attract customers from the general public in the state to the substantial detriment of existing banks in the state." *Id.* § 51–16–41. In addition, the statute makes all such interstate bank acquisitions subject to the approval of the South Dakota Banking Commission (the "Commission") and to any conditions that the Commission deems necessary. *Id.* § 51–16–42.

On May 3, 1984, First City submitted a proposal to the Commission to acquire a new nationally chartered bank to be located in Sioux Falls and designed to engage primarily in offering bank credit card services to customers in states other than South Dakota. Petitioner appeared before the Commission in opposition to the proposal. The Commission authorized the proposed acquisition, subject to the conditions prescribed in the South Dakota statute, and rendered its final approval contingent on approval by the Comptroller of the Currency (the "Comptroller") and the Board. Shortly thereafter, the Comptroller granted preliminary approval for the requested national bank charter, thereby clearing the way for the final steps in organizing the bank. First City then applied to the Board under section 3(a)(3) of the BHCA to acquire all of the voting shares of the newly chartered national bank.

Petitioner intervened in the proceedings before the Board, opposing First City's application. ICBA contended that the Board's approval of First City's application would violate the Douglas Amendment. According to ICBA, the Amendment limits the acquisition of banks by out-of-state bank holding companies solely to state chartered banks and bars the interstate acquisition of national banks. Petitioner argued, alternatively, that even if the Douglas Amendment allows states to permit the acquisition of national banks, application of the South Dakota statute to national banks is unlawful. ICBA asserted that the statute offends federal banking law by imposing conditions and restrictions on the activities of the acquired national bank.

By order dated July 12, 1985, the Board approved First City's application. The Board observed that the prohibitions of the Douglas Amendment can be lifted if the proposed interstate acquisition is specifically authorized by a statute of the state in which the target bank is located. The Board then noted that South Dakota law permits an out-of-state bank holding company to acquire a single *de novo* bank, subject to certain conditions. The Board determined that First City's proposed acquisition conformed to the statute's requirements and that the South Dakota statute explicitly authorized the acquisition, as required by the Douglas Amendment.

The Board then addressed ICBA's arguments. The Board dismissed ICBA's contention that the Douglas Amendment does not authorize the states to permit out-of-state bank holding companies to acquire national banks. Calling upon the language and legislative history of the Amendment, the Board concluded that Congress intended the Douglas Amendment to apply to the interstate acquisition of any bank, whether national or state chartered. The Board also rejected ICBA's argument that the Board should deny the application because the restrictions placed by the South Dakota statute on the operations of national banks acquired under the statute conflict with national banking laws. The Board cited three reasons in support of this position.

First, the Board determined that it was Congress, through the Douglas Amendment, which imposed conditions or restrictions on the operation of a national bank by an out-of-state bank holding company. Second, the Board determined that even if the limitations were viewed as state-imposed, Congress had authorized the states to impose such restrictions. Finally, relying on the Comptroller's prior approval of the national bank charter, the Board found that even absent specific congressional authorization, the Commission's conditions did not so restrict the operation of the proposed bank as to be incompatible with the framework of federal law.

Petitioner raises before this court the same two objections it raised before the Board. First City seeks to protect the decision in its favor by intervening on the Board's behalf.

## II. Discussion

### A. *The Douglas Amendment*

Petitioner's Douglas Amendment claim presents a novel question of statutory construction: Does the Douglas Amendment authorize a state to permit an out-of-state bank holding company to acquire a *national* bank located within its borders? Although Congress enacted the Douglas Amendment more than thirty years ago, neither the Board nor any court has addressed this issue. During the past fifteen years, the Board has routinely approved the acquisition of national banks located in states that have enacted legislation under the Douglas Amendment authorizing the acquisition of in-state banks by out-of-state holding companies. *See, e.g., First Kentucky National Corp.,* 70 Fed.Res.Bull. 434 (1984); *Bank-America Corp.,* 69 Fed. Res.Bull. 568 (1983); *NCNB Corp.,* 68 Fed. Res.Bull. 54 (1982); *Citicorp,* 67 Fed.Res. Bull. 181 (1981). According to the Board, until this case, no party has contended that the Douglas Amendment limits interstate acquisition to state banks only.

The Douglas Amendment consists of two operative provisions. The first provision prohibits interstate bank holding company

expansion generally. The second provision provides for the lifting of this ban under certain circumstances. The parties in this case do not dispute the scope and effect of the first provision, which states:

> no application shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company whichever is later[.]

12 U.S.C. § 1841(d)(1). By its plain language, this provision prohibits the Board from approving the acquisition by a bank holding company of any additional bank located outside the holding company's home state. The statutory definition of "bank" is functional, encompassing "institution[s] organized under the laws of the United States, any State of the United States, the District of Columbia, any territory of the United States, Puerto Rico, Guam, American Samoa, [and] the Virgin Islands." 12 U.S.C. § 1841(c). *See supra* page 430. Thus, the Douglas Amendment's general prohibition clearly applies to acquisition of both state and national banks.

The dispute in this case centers on the scope and effect of the second provision of the Douglas Amendment. The provision states that the prohibition on interstate expansion contained in the first provision stands

> unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication.

12 U.S.C. § 1842(d). Both parties argue that this phrase is clear and unambiguous, but they glean drastically different meanings from it.

Petitioner reads the clause as carving out an exception applicable only to state banks. Under ICBA's reading, states may decide if they want out-of-state bank holding companies to do business within their borders, but if they opt for entry, they may authorize the acquisition of state chartered banks only. The Douglas Amendment retains its prohibition against the acquisition of national banks, even if a state statute expressly allows out-of-state bank holding companies to acquire nationally chartered banks located in the state.

The Board, on the other hand, reads the "unless" clause as triggering a complete suspension of the Douglas Amendment's prohibition against interstate expansion. Under the Board's interpretation, if a state lifts the prohibition on interstate bank acquisition with regard to state chartered banks within its borders, the Amendment itself lifts the prohibition with respect to national banks in a parallel fashion.

Our first and foremost obligation is to accord the Board its interpretive due. As the Supreme Court recently observed in *Securities Industry Association v. Board of Governors of the Federal Reserve System*, 468 U.S. 137, 142, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984), "[t]he Board is the agency responsible for federal regulation of the national banking system, and its interpretation of a federal banking statute is entitled to substantial deference." Accordingly, we must defer to the Board's interpretation of the Douglas Amendment if it "provides a reasonable construction of the statutory language and is consistent with legislative intent." *Securities Industry Association v. Board of Governors of the Federal Reserve System (SIA)*, 468 U.S. 207, 217, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984).

▪ The plain meaning of the Amendment in its entirety supports the Board's reading. By its terms, the first clause of the Amendment prohibits the interstate acquisition of both state and national banks. The second clause provides that the carte blanche prohibition stands *unless* the state permits the interstate acquisition of "such shares or assets of a State bank." The

ordinary meaning of this language compels the conclusion that the entire prohibition lifts upon the state's authorization of interstate acquisition of a "State bank" located within its borders. The "unless" clause describes the triggering event that lifts the general prohibition with respect to all banks—"any additional bank"—located in the state. The Douglas Amendment need not specifically mention "national bank" in order to have this effect. Nor need the state specifically authorize the acquisition of national banks. In fact, the Douglas Amendment renders superfluous a state statute's authorization of interstate acquisitions of nationally chartered banks located in the state. Such state "authorization" would, in any event, be meaningless. Bank holding companies and nationally chartered banks are organized pursuant to federal law and the power of either to acquire or be acquired is governed by federal law.

Petitioner would read the "unless" clause as if it states "except that a state may authorize the acquisition of a State bank." This tortured reading is incompatible with the actual language of the statute; the literal words of the Amendment's second provision do not read as an exception.

The clarity of the language of the Douglas Amendment makes resort to legislative history unnecessary and unavailing. *See Maine v. Thiboutot*, 448 U.S. 1, 6 n. 4, 100 S.Ct. 2502, 2505 n. 4, 65 L.Ed.2d 555 (1980). ICBA insists that the legislative history of the BHCA supports its interpretation of the Douglas Amendment. Even if petitioner were correct, it could not overcome the plain meaning of the statute. Only in the most exceptional case, where there is "a clearly expressed legislative intention to the contrary," can the language of the statute be regarded as anything but conclusive. *North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). *See United States v. Locke*, 471 U.S. 84, 95–96, 105 S.Ct. 1785, 1792–93, 85 L.Ed.2d 64 (1985). In our view, nothing in the legislative history even remotely suggests a congressional intent contrary to Congress' chosen words in the Douglas Amendment.

The BHCA, as originally passed by the House of Representatives in 1955, banned all interstate acquisitions. *See* H.Rep. No. 609, 84th Cong., 1st Sess. (1955). The bill reported out by the Senate Committee on Banking and Currency permitted interstate bank acquisitions conditioned only on approval by the Board. *See* S.Rep. No. 1095, 84th Cong., 2nd Sess. (1955), U.S.Code Cong. & Admin.News 1956, p. 2482. On the floor of the Senate, Senator Douglas of Illinois suggested his amendment to the BHCA as a compromise between the two positions. The Amendment's entire legislative history is confined to the Senate floor debate. In such instances, "the comments of individual legislators carry substantial weight." *Northeast Bancorp*, 472 U.S. at 169–70, 105 S.Ct. at 2551.

Neither of the two Senators on whom ICBA focuses expressed an understanding of the Amendment contrary to our reading of the statute. ICBA notes the remarks of Senator Payne, a supporter of the Amendment, referring to the drafters' intention to give state governments control over bank holding company expansion across state lines through acquisition of "State banks." *See* 102 Cong.Rec. 6862 (1956). It is difficult to discern whether Senator Payne had in mind state chartered banks or simply banks located within a given state. Senator Payne's statements seem more to express a general intent to preserve the states' role in regulating the growth of bank holding companies than to describe specific limitations on state regulation. Even if Senator Payne's comments were read to refer only to state chartered banks, there is no suggestion in his remarks that Congress intended to preclude interstate acquisition of national banks.

Petitioner's attempt to draw support from Senator Douglas is equally unavailing. In describing the effect of his amendment, Senator Douglas stated:

Our amendment would prohibit bank holding companies from purchasing banks in other States unless such purchases by out-of-State holding companies were specifically permitted by law in such States.

102 Cong.Rec. at 6860. Senator Douglas's comments make no distinction between acquisitions of national and state chartered banks under the Amendment. Given that his remarks referred to a statute that defined "bank" as including both national and state banks, his reference to banks must ineluctably be understood as relating to both.

Senator Douglas made it clear that he was using the McFadden Act, 12 U.S.C. § 36 *et seq.* (1982), as the model for his amendment:

> [W]hat our amendment aims to do is to carry over into the field of holding companies the same provisions which already apply for branch banking under the McFadden Act. . . .

102 Cong.Rec. at 6860. The McFadden Act provides that a national bank located in a particular state may establish and operate new branches in the state to the same extent "authorized to state banks by the statute law of the state in question." 12 U.S.C. § 36(c)(2). Where a state statute allows state banks to branch, the McFadden Act bestows the same privilege on national banks located in that state. The McFadden Act gives to the states the opportunity to determine the ability of national banks in those states to branch through the mechanism of controlling state chartered bank branching. The overriding goal of the McFadden Act is to subject national and state chartered banks to the same rules governing expansion by branching and thereby to support the policy of competitive equality in the dual banking structure. *See First National Bank in Plant City v. Dickinson*, 396 U.S. 122, 130–33, 90 S.Ct. 337, 341–43, 24 L.Ed.2d 312 (1969).

In analogizing his Amendment to the McFadden Act, Senator Douglas expressed his intent that the Douglas Amendment operate similarly: state law would set the substantive rules by prescribing the interstate acquisition of state banks, whereas federal law would ensure equivalent treatment for national banks. This understanding comports with the Board's interpretation of the Amendment. Congress provided, by operation of the Douglas Amendment alone, that if a state permits interstate acquisition of its state chartered banks, then it also permits acquisition of national banks to the same extent. Congress hinged the lifting of the entire prohibition on the state's laws as to its state banks precisely because it did not want to rely on the states to provide equivalent treatment for national banks. As with the McFadden Act, federal law—the Douglas Amendment—ensures that equality. Congress was willing to allow states to prohibit the interstate acquisition of state chartered banks and nationally chartered banks located in the state, but Congress was unwilling to allow states to discriminate against banks by permitting the interstate acquisition of its own banks alone. The Douglas Amendment, as interpreted by the Board, thus serves the same competitive equality policy as the McFadden Act.

In contrast, petitioner's interpretation of the Douglas Amendment eliminates altogether the parallel treatment of state and national banks. Its reading of the Amendment makes only state banks eligible for acquisition by out-of-state holding companies; national banks are unable to be acquired similarly. In fact, petitioner's interpretation reduces the analogy between the Douglas Amendment and the McFadden Act to the bare fact that the state is the decision-maker. The plain language and the very legislative history relied on by petitioner evince congressional intent to structure a more meaningful way to carry forward the policies begun in the McFadden Act.

 In sum, the Douglas Amendment permits the approval of an out-of-state bank holding company's acquisition of an in-state national bank if the state in which the national bank is located has authorized the interstate acquisition of local state chartered banks.

**B.** *The South Dakota Bank Acquisition Statute*

Petitioner also challenges the South Dakota bank acquisition statute. Petitioner argues that, even if the Douglas Amendment permits interstate acquisition of na-

tional banks, the Board exceeded its authority or abused its discretion in approving First City's application because the South Dakota statute places impermissible restrictions on the operations of national banks acquired by out-of-state bank holding companies under the statute. The South Dakota statute requires the acquired national bank to operate only a single office and to avoid competing for customers with existing local banks. The statute also authorizes the state Commission to impose any additional conditions it deems necessary.

Nationally chartered banks are federal institutions and, as such, are subject to the paramount authority of federal law. Congress, however, may confer power upon the states to regulate national banks. *See Lewis,* 447 U.S. at 44, 100 S.Ct. at 2019; *Northeast Bancorp,* 472 U.S. at 174, 105 S.Ct. at 2553. Even in the absence of such authorization, states may regulate the operations of national banks so long as the regulation is not repugnant to federal law. *See Davis v. Elmira Savings Bank,* 161 U.S. 275, 287, 16 S.Ct. 502, 505, 40 L.Ed. 700 (1896). A state law limiting the operation of national banks is preempted by federal law and invalid under the Supremacy Clause of the Constitution only if the state law "expressly conflicts with the laws of the United States, and either frustrates the purpose of national legislation or impairs the efficiency of [national banks] to discharge the duties, for the performance of which they were created." *Id.* at 283, 16 S.Ct. at 503. Thus, petitioner's claim raises dual questions of statutory interpretation. We first must consider whether the Douglas Amendment confers upon the states the authority to limit the activities of national banks acquired by out-of-state holding companies. Second, if the Amendment does not confer such authority, we must consider whether the South Dakota statute conflicts with and frustrates federal banking law.

Before turning to these considerations, we address the Board's rejection of the premise of this inquiry. The Board argues that it is Congress and not South Dakota

that restricts the operations of national banks acquired under the South Dakota statute. According to this argument, the South Dakota statute directly imposes no restrictions on national banks acquired by out-of-state bank holding companies, despite the statute's language purporting to do so; the conditions outlined by the South Dakota statute are transmitted to the national banks by the Douglas Amendment, through the mechanism of the Amendment's parallel lifting of the interstate expansion ban. Essentially, the Board asserts that these conditions, as imposed on national banks, are matters of federal law. Thus, the Board concludes that its approval of First City's application raises no potential conflict between state and federal laws.

Although the Board's argument has some initial appeal, that appeal fades upon consideration of the implications of the argument. At bottom, the Board contends that Congress incorporated subsequently adopted substantive state banking law into the Douglas Amendment. Congress clearly has the power to assimilate state law; it even may adopt subsequently enacted state statutes. *See, e.g., United States v. Sharpnack,* 355 U.S. 286, 293–97, 78 S.Ct. 291, 295–98, 2 L.Ed.2d 282 (1958). But state law may impose a myriad of restrictions on the contracts and dealings of state chartered banks; some such restrictions would in all likelihood conflict with existing federal laws governing bank holding companies and their subsidiary nationally chartered banks. To hold that Congress contemplated the adoption of subsequently enacted state banking legislation in the Douglas Amendment, therefore, is to decide that Congress sanctioned either direct conflict between coordinate federal statutes or nullification of the acts of Congress by subsequent and unknown state laws. Such decisions require an unequivocal congressional expression because they are repugnant to venerable rules of statutory construction frequently reaffirmed by the Supreme Court. Congress is presumed to intend to achieve a consistent body of federal law, and repeal of coordinate law by implication is strongly disfavored. *See, e.g., Kremer v. Chemical Construction*

*Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982); *Valley Authority v. Hill,* 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *United States v. Hansen,* 772 F.2d 940, 944 (D.C. Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986). We do not believe that Congress intended to adopt state law that would work a wholly unconsidered denunciation of positive federal law. The Supreme Court apparently agrees. Although neither case dealt with the particular issue at hand, in both *Lewis* and *Northeast Bancorp,* the Supreme Court viewed the statutes at issue as creatures of state law, establishing state-imposed regulations and raising potential federalism concerns. We therefore cannot agree that it is Congress, through silent and blanket assimilation in the Douglas Amendment, that has imposed the restrictions on the operations of First City's acquired national bank.

We turn, then, to the question of whether Congress has authorized the restrictions imposed by the South Dakota statute. Petitioner contends that the BHCA neither allows nor authorizes a state to impose conditions on the activities of either an out-of-state bank holding company or, more particularly, a national banking institution acquired by a bank holding company. ICBA argues that the Douglas Amendment provides only for an "all or nothing" approach: if a state permits interstate acquisition of national banks located within its borders, its permission must be unconditional. ICBA cites to dicta in *Lewis* in which the Supreme Court suggested that "it is doubtful that [the Douglas Amendment] authorizes state restrictions of any nature on bank holding company activities." 447 U.S. at 47, 100 S.Ct. at 2021. Petitioner argues that the Court thereby indicated that states may not utilize the BHCA to limit the activities of a national bank acquired by an out-of-state bank holding company. The dicta in *Lewis,* however, cannot be read so broadly. The Supreme Court did not purport to address this specific issue in *Lewis.* Lewis presented the question of whether the BHCA allowed states to prohibit out-of-state bank holding companies from acquiring in-state investment advisory companies. Nonbanking activities of holding companies are regulated separately under § 4 of the BHCA. The Court held that, whatever the power of the states to regulate banking matters under the Douglas Amendment (§ 3 of the BHCA), the Amendment cannot be read to authorize state discrimination in the regulation of an out-of-state bank holding company's *nonbanking* activities. *Lewis,* 447 U.S. at 47, 100 S.Ct. at 2021. *Lewis,* therefore, does not resolve the issue before this court.

The Board interprets the lifting provisions of the Douglas Amendment to mean that Congress has authorized application of the South Dakota restrictions to national banks. Under the Board's statutory interpretation, the Douglas Amendment's "plenary grant" of authority to the states to lift the Amendment's prohibition on interstate acquisitions necessarily encompasses the authority to enact statutes imposing restrictions on the operations of national banks. The Board draws support for its interpretation from *Northeast Bancorp, supra.* In *Northeast Bancorp,* the Supreme Court held that the Douglas Amendment authorizes the states to grant entry to out-of-state bank holding companies on a limited or conditional basis. But the kind of conditional lifting in *Northeast Bancorp* differed significantly from that provided for in the South Dakota bank acquisition statute. In *Northeast Bancorp,* the Court considered two state statutes that allowed the acquisition of banks located in each state by bank holding companies located in another state if, and only if, the other state's laws contained reciprocal provisions. In addition, the reciprocity arrangement extended only to bank holding companies in states located within a defined geographical region. Unlike the South Dakota statute, these conditional and limited liftings of the Douglas Amendment prohibition in no way restricted the actual banking practices of the acquired banks. Thus, we find no support for the Board's position in the Supreme Court's holding in *Northeast Bancorp.*

We can locate no grounds for declaring that the Douglas Amendment *authorizes* state regulation of the operations of national banks acquired pursuant to the state's "Douglas Amendment" statutes. Neither the Douglas Amendment nor its legislative history speaks to this question, and no court has broached the issue. The Board's notion of congressional authorization returns us to the nettlesome problem posed by the potential conflict between state-imposed conditions and federal banking law. If we find that Congress granted the states the authority to impose conditions on national banks, then the effect will be to give the states the authority to nullify federal banking laws and to regulate an increasing number of national banks in a manner that is repugnant to federal policies. In other words, the Douglas Amendment would operate as an implied statutory repeal of many important federal banking laws. As noted above, "[i]t is ... a cardinal principal of statutory construction that repeals by implication are not favored." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976). *See supra* page 436. Generally, courts will not find repeals by implication unless legislative intent to repeal is "clear and manifest." *Hansen*, 772 F.2d at 944 (citing *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939)). Neither the language of the Amendment nor its legislative history indicates an intention to abrogate extant federal banking law governing bank holding companies and their subsidiary nationally chartered banks. We therefore decline to hold that Congress created, through the Douglas Amendment, the specific authority for South Dakota to impose restrictions on national banks.

Lack of such specific congressional authorization does not mean that states have no power to regulate national banks. States have the same power and jurisdiction they possessed before the Douglas Amendment's enactment—the power to regulate national banks to the extent that such regulation does not conflict with or frustrate federal law. *See Davis*, 161 U.S. at 283, 16 S.Ct. at 503. We reach then the heart of petitioner's objection: whether the South Dakota statute conflicts with federal banking legislation.

Petitioner suggests two ways in which it believes the statute is inconsistent with federal laws. First, ICBA argues that by restricting the acquired national bank to a single office, the statute creates a *per se* prohibition on branch banking in express violation of the McFadden Act. Petitioner misunderstands the McFadden Act's operation in this context. The McFadden Act permits national banks to branch in a state if and to the extent that the state law permits the establishment and operation of branches by state banks. South Dakota law imposes the same branching restrictions on state chartered banks acquired by out-of-state holding companies as it does on national banks similarly acquired. *See* S.D. Codified Laws Ann. § 51–16–41. Thus, the South Dakota statute maintains competitive equality between similarly situated state and national banks. The McFadden Act contemplates precisely this kind of equality. In fact, if the South Dakota statute did not specifically impose the nonbranching (single office) limitation on the acquired national banks, the McFadden Act itself would act in such limitation, by virtue of the statute's single office limitation on acquired state banks.

Second, ICBA argues that by stipulating that the acquired national bank not compete for customers with existing local banks, the South Dakota statute constricts the operation of an otherwise fully operational national bank in contravention of its charter mandate. Petitioner contends that a national banking association is established to discharge all the duties enumerated in its enabling legislation and that there is no such institution as a "special purpose" national bank. ICBA asserts that the South Dakota statute's prohibition on competition frustrates the purpose of national banking legislation and impairs the efficiency and ability of the acquired national bank to discharge its federal banking statutory duties.

In rejecting petitioner's argument, the Board relied, in part, on the Comptroller's previous opinion in issuing a preliminary

national bank charter for a bank in South Dakota organized by Citicorp, a bank holding company located outside South Dakota. Citicorp's application to acquire this new national bank, approved in 1981, was the first application processed under the South Dakota statute. Citicorp's principal stated purpose for organizing the new bank was to engage in consumer credit card services, although the bank holding company also intended to transfer other banking business to the new entity. *See Citicorp*, 67 Fed. Res. Bull. 181 (1981). In his *Citicorp* opinion, the Comptroller addressed the potential state-federal conflict posed by the South Dakota statute. The Comptroller concluded that he was "not prepared to conclude on the record before [him] that the South Dakota statutory scheme, on its face, so restricts the operations of the proposed bank as to be incompatible with the framework of federal law." Op. Compt. Curr., Nov. 19, 1980, at 11–12.

More specifically, the Comptroller addressed the arguments raised by petitioner here. The Comptroller noted that the grant of authority to national banks under the National Bank Act, 12 U.S.C. § 24 (1982), is permissive, rather than mandatory. He observed that an institution rarely contemplates engaging in the full range of permissible activities; many nationally chartered institutions concentrate on a few specific activities. Because "a national bank charter allows an institution to select from among the wide variety of permissible banking activities those activities which it will provide in its banking markets," the Comptroller held that "Citicorp's decision to cause its proposed subsidiary to operate as less than a 'full service bank,' so as to avoid conflict with the state statute, is a business decision which does not necessarily result in a course of action incompatible with the National Bank Act or other federal statutes." *Id.* at 12 n. 8. The Comptroller further found that the South Dakota statutory restrictions presented no threat to the successful operation of the proposed bank, since they did not require the bank to operate in a manner that was unsafe or unsound.

The same reasoning applies to First City's proposed acquisition of its new national bank under the South Dakota statute. Like Citibank, First City proposed to limit its subsidiary's activities principally to offering credit card services. Also like Citibank, First City proposed to provide retail and commercial deposit-taking, lending, and checking services to the local community to the extent permitted by the statute and to offer additional services not already provided, including the provision of overline banking services to other banks in South Dakota. First City's decision to relocate its consumer credit card business to South Dakota, like Citibank's similar decision, is a business decision motivated, no doubt, by the absence in South Dakota of usury ceilings on consumer loan receivables. In this context, the Board reasonably placed significant reliance on the Comptroller's *Citicorp* opinion in determining that First City's decision to limit its activities (in part, to comply with the South Dakota statute) is compatible with the National Bank Act's grant of greater powers to national banks.

By arguing that the South Dakota statute frustrates the purposes of the national banking laws, in effect, ICBA challenges the Comptroller's issuance of First City's national bank charter which complies with the state statute's restrictions. In examining petitioner's argument, we must defer to the reasonable determinations of the agency charged with the administration of those acts of Congress. The primary supervisor of national banks and the agency charged with enforcement of the National Bank Act is the Office of the Comptroller of the Currency. Congress has conferred broad statutory powers on the Comptroller to enable him to perform his supervisory and regulatory functions. "[W]e cannot come lightly to the conclusion that the Comptroller has authorized activity that violates the banking laws." *Investment Company Institute v. Camp*, 401 U.S. 617, 626, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971). In addition to his issuance of Citibank's and First City's South Dakota national bank charters, the Comptroller has repeatedly chartered national "credit card"

banks for acquisition under state statutes similar to South Dakota's and either implicitly or expressly found that these statutes do not violate national banking law. *See, e.g., First Kentucky National Corp.,* 70 Fed. Res. Bull. 434 (1984); *Provident National Corp.,* 68 Fed. Res. Bull. 260 (1982).

■ We have no doubt but that the Comptroller's construction and application of the National Bank Act in this context is reasonable. There is nothing in the language or legislative history of the National Bank Act that indicates congressional intent that the authorized activities for nationally chartered banks be mandatory. Restriction of a national bank's activities to less than the full scope of statutory authority conflicts with the purposes of the Act only if it undermines the safety and soundness of the bank or interferes with the bank's ability to fulfill its statutory obligations. That judgment requires consideration of the particular legal and business circumstances of the individual banks—a judgment within the particular expertise of the Comptroller and reserved to his chartering authority. We hold, therefore, that the Board correctly determined that the South Dakota statute, as applied to First City, does not violate federal banking legislation. Consequently, we find that the Board's approval of First City's application was not invalid.

Our holding today should not be understood as a wholesale endorsement of the South Dakota statute. We do not conclude that the statute will not offend federal banking law in future applications. We hold only that as presently interpreted, administered and applied, it does not conflict with the National Bank Act and other federal banking statutes. We recognize that there is ample potential for state-federal conflict under the terms of the statute. The statute specifically renders acquisitions "subject to such conditions as the [South Dakota Banking C]ommission deems necessary." S.D. Codified Laws Ann. § 51–16–42. There is no express statutory limitation on the Commission's conditioning authority. As yet, the Commission has not imposed additional conditions on

out-of-state bank holding companies acquiring nationally chartered banks in South Dakota under the statute. No additional conditions were placed on First City. Any condition placed on a bank holding company that in any way precluded or interfered with the ability of the company's subsidiary to carry out its obligations under federal banking law would be impermissible. We assume that the Comptroller and the Board would so hold in any review of such bank holding company's activities.

## III. CONCLUSION

We do not doubt that the trend toward establishment of limited service banks controlled by out-of-state bank holding companies raises public policy questions. The Board is not insensitive to these considerations. In approving First City's application, the Board expressed its concern regarding state statutes that, like the South Dakota statute, permit the entry of out-of-state bank holding companies in order to shift jobs and revenue from other states, while limiting the in-state activities of banks owned by out-of-state companies so as to avoid competition with in-state banking organizations. The Board cautioned that proliferation of these statutes can only result in a serious impairment of local and national banking standards. But the South Dakota statute is not unlawful and, pursuant to the Douglas Amendment, the Board was constrained to approve the acquisition authorized by the statute. The Douglas Amendment may be imperfect in this regard. Up until now, however, Congress has provided for the regulation of bank holding companies through the BHCA. "If the [Act] falls short of providing safeguards desireable or necessary to protect the public interest, that is a problem for Congress, and not the Board or the courts, to address." *Dimension Financial,* 106 S.Ct. at 689.

The Douglas Amendment makes clear on its face the congressional design for parity of treatment between interstate acquisition of state banks and national banks. The Board's approval of First City's acquisition was consonant with that design. Accord-

ingly, we deny ICBA's petition for review of the Board's approval of First City's application for acquisition of a new nationally chartered bank to be located in South Dakota.

*It is so ordered.*