Justice Devine delivered the opinion of the Court.
*92 A taxpayer that conducts business in multiple states must apportion its business revenue among the states in which it does business. For the Texas franchise tax, section 171.106 of the Tax Code provides for such apportionment under a single-factor formula, which compares the taxpayer's gross receipts derived from its Texas business to its gross receipts everywhere. Another provision of the Tax Code, section 141.001, adopts the Multistate Tax Compact. This Compact sets out a three-factor formula for apportioning "business income" for an "income tax" and provides that a taxpayer subject to a state income tax may elect to apportion its income "in the manner provided by the laws of such state" or may elect to apportion using the Compact's three-factor formula. TEX. TAX CODE § 141.001, arts. III.1, IV.9.
At issue here is whether the franchise tax is an "income tax" to which the Compact applies, thus invoking the Compact's election and apportionment provisions. If it is an income tax, additional issues include (1) whether Tax Code section 171.106 nevertheless precludes a taxpayer from using the Compact's three-factor formula, or (2) whether Texas' membership in the Compact prevents the Texas Legislature from requiring a taxpayer to use only the single-factor formula when apportioning its tax base to Texas.
*93 The court of appeals did not consider the latter two issues. 471 S.W.3d 138, 147 (Tex. App.-Austin 2015). It concluded instead that the Compact's election, and therefore its three-factor apportionment formula, did not apply because the franchise tax was not an income tax within the Compact's meaning. Id. The court accordingly affirmed the trial court's summary judgment, holding that apportionment of the Texas franchise tax is exclusively the province of chapter 171. Id. We agree and affirm.
I. Background
Graphic Packaging Corporation sells consumer product packaging throughout the United States, including Texas. Because Graphic does business in Texas, it must pay a franchise tax. This tax applies to every for-profit entity doing business or chartered in Texas that is distinct from its owners. In re Nestle USA, Inc. , 387 S.W.3d 610, 614 (Tex. 2012). And because Graphic conducts business in multiple states it must also determine the portion of its total business that is taxable in Texas. For the Texas franchise tax, Tax Code section 171.106 provides that the taxpayer apportion its tax base (labeled in the statute as the taxpayer's "margin") to Texas by multiplying its total margin by a single factor: the fraction of its total gross receipts that are derived from its Texas business. See TEX. TAX CODE § 171.006(a) (providing a gross-receipts fraction for apportioning a taxpayer's margin); see also id. §§ 171.002, .103 (describing calculation of gross receipts from taxpayer's Texas business), .105 (describing calculation of gross receipts from taxpayer's total business); and see id. §§ .101, .1011-.1013 (addressing determination of taxpayer's margin).
For tax years 2008-2009, Graphic initially used section 171.106's gross-receipts fraction to apportion its margin.[1] Graphic later amended those franchise tax reports and calculated its 2010 tax, using the apportionment formula provided in chapter 141 of the Tax Code-Texas' codification of the Multistate Tax Compact.[2] Graphic argued that the franchise tax was essentially an income tax to which chapter 141's alternative apportionment scheme could be applied at the taxpayer's election.
The Texas Comptroller disagreed. He denied the refunds and assessed a deficiency for 2010, concluding that section 171.106's gross-receipts fraction was the exclusive method to determine the franchise tax. Graphic subsequently paid the assessed 2010 taxes under protest after unsuccessfully pursuing administrative relief.
After exhausting its administrative remedy, Graphic filed suit in district court, seeking $821,961 for tax years 2008-2010 on the ground that it was entitled to apportion its margin using chapter 141's three-factor apportionment formula.[3] The *94 parties filed cross-motions for partial summary judgment on the apportionment issue. The court granted the Comptroller's motion, denied Graphic's motion, and, after Graphic non-suited its other claims, rendered a final judgment for the Comptroller. Graphic appealed, and the court of appeals affirmed, holding that chapter 141's income-apportionment provisions do not apply to the franchise tax because it is not an "income tax." 471 S.W.3d at 147.
II. Is the Texas franchise tax an income tax?
Graphic argues that the franchise tax is an "income tax" because it satisfies chapter 141's definition of the term. Chapter 141 defines "income tax" as
a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.
TEX. TAX CODE § 141.001, art. II.4. Graphic contends that its taxable "margin" for franchise tax purposes under chapter 171 is essentially the same thing as its "net income" under chapter 141. According to Graphic, both are determined by "deducting expenses from gross income," one or more of which "are not specifically and directly related to particular transactions." Id. And because margin and net income are synonymous, Graphic submits the court of appeals erred in denying Graphic the use of chapter 141's three-factor apportionment formula under the election provided by that chapter. Id. § 141.001, arts. III.1, IV.
Chapter 171 specifically pertains to the franchise tax and provides several alternatives for calculating a taxpayer's margin. TEX. TAX CODE §§ 171.001(a), .101. The calculation begins with "total revenue," a figure derived by adding together select amounts reportable as gross income on a federal tax return, subtracting bad debts and other items included on the federal return, and excluding receipts associated with various transactions. Id. §§ 171.101(a), .1011. From total revenue, the taxpayer deducts the largest of: (1) 30% of total revenue, (2) $1 million, (3) the cost of goods sold, or (4) the compensation paid including benefits, subject to a cap. Id. §§ 171.101(a), .1012, .1013. The result is the taxpayer's margin. Id. § 171.101(a).
But this calculation is not the tax base for all taxpayers. A taxpayer whose total revenue does not exceed $20 million may calculate its franchise tax using simply its total revenue. Id. § 171.1016. Although taxpayers who use total revenue as their tax base forego the alternative deductions listed above, they pay a lower rate under what the statute terms the "E-Z Computation and Rate." Id.
For the tax years at issue, Graphic calculated its margin by subtracting the cost of goods sold from total revenue. Because those expenses included indirect costs "not specifically or directly related to a particular transaction," Graphic concludes the franchise tax also constituted an "income tax" under chapter 141, entitling it to elect apportionment under that chapter's three-factor formula. See TEX. TAX CODE § 141, arts. II.4, III.1 (providing taxpayers subject to an income tax an apportionment election); id. §§ 171.101(a), .1012 (providing *95 a deduction for costs of goods sold among other alternatives).
The court of appeals disagreed, concluding that the correlation between a taxpayer's margin and net income was insufficient to make the franchise tax an income tax. 471 S.W.3d at 144. In fact, the court noted the anomalous possibility that a taxpayer might have a positive margin and thus owe franchise tax even in the absence of net income. Id. at 144 & n.3. After examining the various alternatives for determining the tax base for franchise tax purposes, the court concluded that margin and net income are not the same. Id. at 144. For example, the court reasoned that a franchise tax based on "total revenue" as in the case of E-Z filers or one premised on 70% of total revenue under another alternative could not "fairly be read to mean 'net income.' " Id. The court reasoned further that subtracting a fixed amount, such as a $1 million deduction from total revenue was "not the same as 'deducting expenses from gross income.' " Id. (comparing TEX. TAX CODE § 171.101 and id. § 141.001, art. II.4). Similarly, the court found the cost-of-goods-sold and compensation deductions too selective and limiting to constitute the deduction of expenses from gross income. Id. And having found the existence of significant distinctions between a taxpayer's margin under chapter 171 and a taxpayer's net income under chapter 141, the court held the franchise tax was not an income tax. Id. at 147.
The Comptroller, of course, agrees that the franchise tax is not an income tax but adds that the most direct resolution of the issue lies in an uncodified provision included in the 2006 act that restructured the franchise tax. There, the Legislature stated: "The franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is not an income tax and Pub. L. No. 86-272 does not apply to the tax." Act of May 2, 2006, 79th Leg., 3d C.S., ch.1, § 21, 2006 Tex. Gen. Laws 1, 38 (emphasis added). The Comptroller submits that in providing by law that the franchise tax "is not an income tax," the Legislature could not have meant for the tax to meet a definition of "income tax" in the very code it was amending. See, e.g., In re Bridgestone Americas Tire Operations, LLC , 459 S.W.3d 565, 572 (Tex. 2015) (quoting Acker v. Tex. Water Comm'n , 790 S.W.2d 299, 301 (Tex. 1990) ("We presume the Legislature enacted the statute 'with complete knowledge of the existing law and with reference to it.' ")).
But of course the Legislature's stated intent not to create an income tax cannot alter the facts. If the franchise tax is indeed a tax on net income as chapter 141 defines income tax, the Legislature's disclaimer is for naught. But some ambiguity exists here. While deductions for the cost of goods or wages are perhaps sufficiently close to chapter 141's income tax definition, other deductions that permit a fixed amount or percentage to be subtracted from total revenue are, as the court of appeals observed, "not the same as 'deducting expenses from gross income.' " 471 S.W.3d at 144. And certainly chapter 141's income tax definition says nothing about a franchise tax based solely on a taxpayer's total revenue. TEX. TAX CODE § 141.001, art. II.4.
In the court of appeals, Graphic argued that the choice was a binary one, contending "that 'a tax on business activity' must be either an 'income tax' or a 'gross receipts tax' as those terms are defined in chapter 141." 471 S.W.3d at 146. Graphic urged that the franchise tax was clearly not a gross receipts tax, as defined, and therefore must be an income tax. See TEX. TAX CODE § 141.001, art. II.6 (defining a gross receipts tax). The court of appeals disagreed with Graphic's premise that the *96 franchise tax had to be either a "gross receipts tax" or an "income tax," concluding that the tax did not fall within the chapter's definition of either term. 471 S.W.3d at 146. Instead, the court noted that the chapter "expressly recognizes and defines other types of taxes, including defining 'tax' to include 'any other tax which has a multistate impact.' " Id. (citing TEX. TAX CODE § 141.001, art. II.4-.9). The Comptroller similarly submits that the franchise tax is neither an "income tax" nor a "gross receipts tax" but rather a hybrid of both, rendering chapter 141's apportionment scheme inapplicable. See TEX. sTax Code § 141.001 , ART. III.3 ("NOTHING IN THIS ARTICLE RELATES TO THE REPORTING OR PAYMENT OF ANY TAX OTHER THAN AN INCOME TAX."); SEE ALSO CYNTHIA M. OHLENFORST, THE NEW TEXAS MARGIN TAX: MORE THAN A MARGINAL CHANGE TO TEXAS TAXATION, 60 Tax Law. 959, 959 (2007) (DESCRIBING THE FRANCHISE TAX AS "AN ENTIRELY NEW TAX THAT COMBINES ELEMENTS OF A GROSS RECEIPTS TAX WITH ELEMENTS OF A NET INCOME TAX"); JOHN A. BIEK, ALTERNATIVE FORMULARY APPORTIONMENT UNDER THE MULTISTATE TAX COMPACT, 16 J. Passthrough Entities 41, 46 (2013) (OBSERVING THAT THE MARGIN TAX MIGHT NOT BE DETERMINED TO BE AN INCOME TAX BECAUSE IT "IS COMPUTED ON A MODIFIED REVENUE TAX BASE").
Even were we to agree with Graphic that its franchise tax for the years in question amounted to the same thing as chapter 141's income tax (an issue we do not decide), Graphic must still establish that the Legislature did not, or could not, make chapter 171's single-factor apportionment formula the exclusive means for apportioning the Texas franchise tax. We turn then to the issues the court of appeals did not consider: (1) whether Tax Code section 171.106 precludes a taxpayer from using the Compact's three-factor formula, and (2) whether Texas' membership in the Compact prevents the Legislature from requiring the taxpayer to use only the single-factor formula to apportion the franchise tax.
III. Does Tax Code § 171.106 preclude a taxpayer from using the Compact's three-factor formula to apportion the franchise tax?
The Comptroller argues that section 171.106 requires that a taxpayer use the single-factor, gross-receipts formula when apportioning its margin for franchise tax purposes. Section 171.106 provides:
Except as provided by this section, a taxable entity's margin is apportioned to this state to determine the amount of tax imposed under Section 171.002 by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.
TEX. TAX CODE § 171.106(a) (emphasis added). Although the section provides for limited exceptions, the Comptroller notes that the Compact's three-factor formula is not one of them. The only exceptions "provided by this section" are: (1) different apportionment fractions related to investment companies and retirement plans, id. § 171.106(b), (c) ; and (2) changes to the gross-receipts figure for certain transactions and entities, id. § 171.106(d) - (g). The Comptroller concludes that Graphic's reading of the Compact to provide an alternative method of apportioning margin creates an irreconcilable conflict because section 171.106 permits exception to single-factor apportionment only as "provided by this section." Id. § 171.106(a) (emphasis added).
*97 Graphic responds that sections 141.001 and 171.106 can be harmonized so that neither is rendered meaningless. The Compact's election feature, which anticipates that a state may adopt a formula that differs from the Compact's formula, harmonizes the two, according to Graphic, making the Compact formula and the Texas formula equally enforceable alternatives. Graphic submits that a plurality of the Michigan Supreme Court similarly harmonized and preserved the Compact's apportionment election notwithstanding a subsequently enacted statute providing for a mandatory state apportionment formula. See Int'lBus. Mach. Corp. v. Dep't of Treasury , 496 Mich. 642,852 N.W.2d 865, 875 (2014) (plurality op.).[4] Graphic concludes that nothing in section 171.106(a) makes the gross-receipts formula the sole apportionment method available to Texas taxpayers.
The Comptroller agrees that section 171.106(a) does not make the gross-receipts formula the sole apportionment method but only because the section internally provides its own exceptions. TEX. TAX CODE § 171.106. For example, the tax base derived from the sales of services to or for a regulated investment company is apportioned with a fraction based on company shares, whereas a tax base derived from the sales of services to an employee retirement plan is apportioned with a fraction based on plan beneficiaries. Id. § 171.106(b), (c). The Comptroller emphasizes again that the Compact is not one of the exceptions. See generally id. § 171.106. The Comptroller further rejects the notion that the Compact's election feature somehow harmonizes the competing formulas. He submits that the task is not to harmonize the formulas, but to harmonize the statutes, and that the Compact's election feature does not do that work. Article III.1 presumes that a state's tax laws (other than the Compact) merely "provide[ ]" a different "manner" of apportioning income. Id. § 141.001, art. III.1. Article III.1 does not anticipate or address a state statute that expressly makes an apportionment method exclusive, as section 171.106 does in the Comptroller's view. The Comptroller concludes that the Tax Code cannot be read to allow taxpayers to elect to apportion margin using the Compact's three-factor formula and still give full meaning to section 171.106's limiting phrase "[e]xcept as provided in this section." Id. § 171.106(a). Rather than harmonize those words, the Comptroller submits, Graphic proposes to resolve the conflict against them.
We agree that reading the Compact to provide an alternative method of apportioning margin creates an irreconcilable conflict with section 171.106. Permitting a taxpayer to elect under Article III.1 to apportion margin using Article IV's three-factor, income-apportionment formula cannot be reconciled with *98 section 171.106(a)'s directive to apportion margin using the single, gross-receipts fraction "[e]xcept as provided by this section." Id. When statutes irreconcilably conflict, traditional rules of statutory construction dictate that the later enacted and more specific legislation should control.
The Code Construction Act codifies these traditional rules, which resolve the conflict here in favor of section 171.106(a). First, the act provides that "if statutes enacted at the same or different sessions of the legislature are irreconcilable, the statute latest in date of enactment prevails." TEX. GOV'T CODE § 311.025(a). The Legislature adopted the Compact in 1967, but added the "except as provided" clause to section 171.106 in 1991. See Act of May 17, 1967, 60th Leg., R.S., Ch. 566, § 1, 1967 Tex. Gen. Laws 1254; Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.07, 1991 Tex. Gen. Laws 134, 157-58 (eff. Jan. 1, 1992). Second, the Code Construction Act provides that if a general provision irreconcilably conflicts with a special provision, "the special or local provision prevails as an exception to the general provision." TEX. GOV'T CODE § 311.026(b) ; see also Jackson v. State Office of Admin. Hearings , 351 S.W.3d 290, 297 (Tex. 2011) (applying both statutory construction aids). Section 171.106 specifically concerns apportioning margin for the Texas franchise tax. TEX. TAX CODE § 171.106. By contrast, Articles III and IV of the Compact concern a general category of state "income taxes." Id. § 141.001, arts. III-IV. As the later-enacted, more specific statute, section 171.106 prevails.
But Graphic asserts that the only way for section 171.106 to prevail over the Compact's apportionment-election provision is to hold that section 171.106 impliedly repealed section 141.001, at least as applied to the franchise tax. And Graphic submits that the presumption against implied repeals should guide us here. See Standard v. Sadler , 383 S.W.2d 391, 395 (Tex. 1964) (noting that "repeal by implication is not favored"); Gordon v. Lake , 163 Tex. 392, 356 S.W.2d 138, 139 (1962) (noting that there is no repeal by implication if statutes can be harmonized).
The Comptroller responds that in 1991 the Legislature in fact expressly barred all applications of the Compact to the franchise tax, including those relating to income apportionment, when it "shifted the primary basis for the franchise tax [ ] from capital to 'net taxable earned surplus'-i.e., income." Nestle , 387 S.W.3d at 614. These revisions to the franchise tax included section 171.112(g), which succinctly stated: "Chapter 141 does not apply to this chapter [171]." Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.10, 1991 Tex. Gen. Laws at 162 (codified at TEX. TAX CODE § 171.112(g) (1992)). When the Legislature again restructured the franchise tax in 2006, however, it deleted section 171.112 entirely. Act of May 2, 2006, 79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws at 28. Because the deletion included subsection (g)'s prohibition, Graphic infers that the Legislature no longer desired to override the Compact's apportionment provisions. The Comptroller responds that a more reasonable explanation exists for the deletion.
As the court of appeals noted, former section 171.112 was captioned and primarily addressed "gross receipts for taxable capital." 471 S.W.3d at 146. The Legislature repealed section 171.112 entirely, not just subsection (g), when it purged all provisions concerning the abandoned taxable-capital tax base. Act of May 2, 2006, 79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws at 28. Moreover, because section 171.112(g) was a blanket prohibition on applying the Compact to the franchise tax, it was necessary to remove it to avoid a *99 conflict with 2006 revisions that expressly incorporated part of the Compact formula into the combined-report rules. TEX. TAX CODE § 171.1014(a). But, the Comptroller submits, rolling back that blanket prohibition did not signal the Legislature's intent to activate the Compact for tax-base apportionment, given the act's retention of section 171.106's exclusive apportionment framework and the disclaimer that "[t]he franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is not an income tax." Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 21, 2006 Tex. Gen. Laws at 38. We agree with the Comptroller's assessment.
The franchise-tax calculation has changed over time, but from 1897 to 1991 it was based on some measure of the taxpayer's capital or net worth. Act approved Apr. 20, 1897, 25th Leg., R.S., Ch. 104, § 1, 1897 Tex. Gen. Laws 140, 141 ("authorized capital stock"); Act of July 30, 1959, 56th Leg., 3d C.S., ch. 1, § 12.01, 1959 Tex. Gen. Laws 187, 306 ("taxable capital"); Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 171.102, 1981 Tex. Gen. Laws 1490, 1697 (same). Thus when the state joined the Compact in 1967, corporate income played no role in calculating the franchise tax. That changed in 1992. Effective that year, the Legislature added "earned surplus"-an adjusted version of "reportable federal taxable income"-as an alternate franchise tax base. Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.09, 1991 Tex. Gen. Laws at 159-60. Different tax rates applied to capital and earned surplus, and the taxpayer used whichever tax base yielded the higher tax. See id. § 8.03, 1991 Tex. Gen. Laws at 153. But even in those instances in which the taxpayer used earned surplus, the Legislature clearly indicated that chapter 171 was to control rather than the Compact. See id. § 8.10, 1991 Tex. Gen. Laws at 162 (stating that "chapter 141 does not apply to this chapter"). The 2006 amendments did not alter that relationship. Section 171.106 continues to provide the exclusive formula for apportioning the franchise tax and, by its terms, precludes the taxpayer from using the Compact's three-factor formula.
IV. Does Texas' membership in the Multistate Tax Compact prevent the Legislature from requiring the taxpayer to use only the Texas formula to apportion the taxpayer's margin for purposes of the franchise tax?
Finally, Graphic submits that, if the Compact and chapter 171 cannot be harmonized, it is section 171.106 that must yield, not the Compact. In Graphic's view, the Compact is an agreement in which Texas and the other "party states have voluntarily and contractually agreed to cede their sovereignty as to its subject matter." Having ceded sovereignty pursuant to the Compact's terms, Graphic infers that no member state may legislate inconsistently with those terms until and unless that state formally repeals the entire Compact as per Article X.2.[5] And because Texas willingly ceded sovereignty by affording the Compact Election and Compact Formula, Graphic concludes the state may not legally enforce inconsistent legislation. Thus, former section 171.112(g)'s declaration that the Compact did not apply to the franchise tax was, in Graphic's view, a nullity. To hold otherwise, Graphic contends, violates not only the Contract *100 Clause of the United States Constitution[6] but also threatens the foundation of other compacts that lack formal Congressional approval.
The Comptroller responds that not all interstate compacts create binding contracts and that this Compact does not contractually bar the state from restricting the operation of its apportionment provisions in Texas. In fact, the Comptroller suggests that Graphic's interpretation of the Compact as a binding limitation on the state's taxing power would render it unconstitutional in many current and former Compact states, including Texas. See TEX. CONST. art. VIII, § 4 (providing that "[t]he power to tax corporations and corporate property shall not be surrendered or suspended by act of the Legislature, by any contract or grant to which the State shall be a party").[7] The Comptroller concludes that Graphic's construction is therefore one the drafters could not have intended. Moreover, the Comptroller submits that other jurisdictions have roundly rejected arguments similar to Graphic's here. See Gillette Co. v. Franchise Tax Bd., 62 Cal.4th 468, 196 Cal.Rptr.3d 486, 363 P.3d 94, 99-103 (2015), cert. denied , --- U.S. ----, 137 S.Ct. 294, 196 L.Ed.2d 238 (2016) (holding that the Compact does not contractually bar states from overriding the Compact's apportionment provisions); Kimberly-Clark Corp. v. Comm'r of Revenue , 880 N.W.2d 844, 848-52 (Minn. 2016), cert. denied --- U.S. ----, 137 S.Ct. 598, 196 L.Ed.2d 476 (2016) (holding that legislature did not violate the Contract Clause when repealing Articles III & IV of the Compact and that, if the Compact apportionment election were a contractual obligation, it would violate Minnesota's constitutional prohibition against contractual suspensions of the taxing power); Gillette Commercial Operations N. Am. & Subsidiaries v. Dep't of Treasury, 312 Mich.App. 394, 878 N.W.2d 891, 902-06 (2015), appeal denied, 499 Mich. 960,880 N.W.2d 230 (2016) (holding that the Compact is not a binding contract under Michigan law and contains no features of a binding interstate compact);[8] and Health Net, Inc. v. Dep't of Revenue, No. TC-5127, 2015 WL 5249431, at *27 (Or. T.C. Sept. 9, 2015) appeal pending, No. S06365 (Or.) (argued Sept. 19, 2016) (holding the Compact is not contractually *101 binding and, even if it were, Oregon's statute overriding the Compact's apportionment provisions would not violate the Contract Clause). The Comptroller concludes that the Compact is in the nature of an advisory compact containing model laws, rather than a binding regulatory compact creating reciprocal obligations among the member states.
We agree that the Multistate Tax Compact is not a binding regulatory compact. The United States Supreme Court has indicated that binding regulatory compacts typically share similar features, such as: (1) the establishment of a joint regulatory body; (2) state enactments that require reciprocal action to be effective; and (3) the prohibition of unilateral repeal or modification of their terms. See Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys. , 472 U.S. 159, 175, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985) (discussing "classic indicia" of a binding regulatory compact); see also Seattle Master Builders Ass'n v. Pac. Nw. Power & Conservation Planning Council , 786 F.2d 1359, 1363 (9th Cir. 1986) cert. denied 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987) (applying the "indicia" identified by the Supreme Court). This Compact does not exhibit these characteristics. Gillette, 196 Cal.Rptr.3d 486, 363 P.3d at 99-103 ; Gillette Commercial , 878 N.W.2d at 905-06.
For example, the Compact does not create a regulatory body. It creates the Multistate Tax Commission, TEX. TAX CODE § 141.001, art. VI, but that body does not possess regulatory authority. The Commission itself acknowledges as much in its amicus curiae brief in this Court.[9] The United States Supreme Court has similarly noted that the Compact did not affect "any delegation of sovereign power to the Commission:"
This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission. Moreover, ... each State is free to withdraw at any time.
U.S. Steel Corp. v. Multistate Tax Comm'n , 434 U.S. 452, 473, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978).
The Commission submits it is not the kind of regulatory body that operates by imposing requirements or that polices member compliance with Commission policy. The Commission's uniformity efforts are, by design, voluntary. The Commission thus "promot[es] uniformity or compatibility in significant components of tax systems" and "avoid[s] duplicate taxation," two of the Compact's stated purposes, by engaging the states in a voluntary process, not by compelling them to conform. See TEX. TAX CODE § 141.001, art. I. One example is the Commission's Uniformity Committee. Established to promote uniformity and compatibility in state tax laws, the committee is open to any state regardless of membership status or involvement in *102 other Commission programs.[10]
A second feature of a binding regulatory compact is the inclusion of "state enactments which require reciprocal action for their effectiveness." Seattle Master Builders , 786 F.2d at 1363 ; see also Ne. Bancorp , 472 U.S. at 175, 105 S.Ct. 2545. The Comptroller offers the Interstate Compact for Adult Offender Supervision as an example. It provides a mechanism for Texas parolees to serve parole in other compact states, and vice-versa. TEX. GOV'T CODE § 510.017, art. I. That agreement requires reciprocal action to be effective because, among other things, a "sending" state "transfer[s] supervision authority" over a parolee to a "receiving" state, which in turn must let a sending state's officials enter the receiving state to "retake" an offender for parole violations. Id.
The Multistate Tax Compact does not require similar reciprocal action to affect its substantive terms. Gillette , 196 Cal.Rptr.3d 486, 363 P.3d at 100-01 ; Gillette Commercial , 878 N.W.2d at 905. The Compact "does not purport to authorize the member States to exercise any powers they could not exercise in its absence." U.S. Steel , 434 U.S. at 473, 98 S.Ct. 799. Absent the Compact, each state administers its tax laws, including tax-base apportionment, without reference to or consideration of the other states' laws. See Moorman Mfg. Co. v. Bair , 437 U.S. 267, 278-79, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) (noting that states enact differing apportionment formulas "based on political and economic considerations that vary from State to State"). The Compact does not change that. A Compact state can allow taxpayers to exercise Article III.1's option and use Article IV to apportion income regardless of how other states tax or apportion that income or whether those states are even Compact members. TEX. TAX CODE § 141.001, art. IV.2-3 (requiring only that the taxpayer's income be "taxable" in another state).
A third characteristic of a binding regulatory compact is "conditional consent" that prohibits members from unilaterally repealing or modifying their participation. Seattle Master Builders, 786 F.2d at 1363 ; see also Ne. Bancorp, 472 U.S. at 175, 105 S.Ct. 2545. The Compact provides that a state "may withdraw from this compact by enacting a statute repealing the same." TEX. TAX CODE § 141.001, art. X.2. Withdrawal here is unilateral; it requires no notice, post-withdrawal performance, or other condition. See id.
But Graphic submits that an express withdrawal provision is an element of a binding contract among the member states, citing several examples. See, e.g. , TEX. FAM. CODE § 162.102, art. IX (Interstate Compact on Placement of Children); TEX. GOV'T CODE § 510.017, art. XI (Interstate Compact for Adult Offender Supervision); TEX. INS. CODE § 5001.002, art. XIV (Interstate Insurance Product Regulation Compact). The Comptroller responds that these compacts are distinguishable because they do not permit unconditional withdrawal. TEX. FAM. CODE § 162.102, art. IX (conditioning withdrawal on notifying *103 party states' governors, delaying withdrawal's effective date for two years, and requiring continuing performance of obligations for placements made before withdrawal); TEX. GOV'T CODE § 510.017, art. XI.3-4 (requiring notice to compact agency of introduction of repealing legislation and performance of obligations that extend beyond withdrawal); TEX. INS. CODE § 5001.002, art. XIV.1 (requiring notice to compact agency and states of introduction of repealing legislation and performance of obligations that extend beyond withdrawal unless released by mutual agreement of the compact agency and states).
Graphic nevertheless contends that the withdrawal provision here does not permit piecemeal alterations, implicit revocation, or tacit elimination of Compact provisions. Graphic concedes that a state is free to withdraw from the Compact completely, but argues that a member state remains bound by the Compact's terms until it formally and completely withdraws.
Although the Compact does not explicitly allow a member state to unilaterally modify its participation, neither does it prohibit a member from doing so. The Comptroller suggests that such silence is tantamount to approval. See Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co. , 470 U.S. 451, 465-66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (stating it "well-established" that, "absent some clear indication that the legislature intends to bind itself contractually," enacted laws do not create contractual rights); see also Tarrant Reg'l Water Dist. v. Herrmann , 569 U.S. 614, 632, 133 S.Ct. 2120, 186 L.Ed.2d 153 (2013) (observing that because "States rarely relinquish their sovereign powers," "when they do we would expect a clear indication of such devolution, not inscrutable silence").
The Compact states have consistently construed that silence to mean that members may unilaterally change or restrict the Compact's terms in their respective laws. Over 45 years ago, the Compact's membership unanimously ratified Florida's decision to repeal the Compact's income-tax articles in its own law and mandate a different apportionment method. Since then several former and current Compact members have also modified their laws to restrict the Compact's apportionment provisions in their jurisdictions.[11] The Commission advises that of the 16 current Compact members, only five continue to require the Compact's three-factor apportionment formula.[12] Nine members have adopted a different apportionment formula.[13] The Commission submits that none of *104 the nine permit the apportionment election in Article III.1.[14]
The power to enact our state laws together with the power to amend or repeal existing state law is vested in the Texas Legislature. TEX. CONST. art III, § 1. The Legislature's power to amend or repeal an earlier statute is generally limited only by federal or state constitutional provisions or federal law. Walker v. Baker , 145 Tex. 121, 196 S.W.2d 324, 328 (1946). Moreover, as a general rule, one "legislature cannot prevent future legislatures from amending or repealing a statute." Cent. Power & Light Co. v. Pub. Util. Comm'n , 649 S.W.2d 287, 289 (Tex. 1983). Nowhere is this more apparent than in the field of taxation. Hegar v. Texas Small Tobacco Coal., 496 S.W.3d 778, 785 (Tex. 2016) (quoting In re Nestle, 387 S.W.3d at 623 ("Above all, 'the Legislature must have discretion in structuring tax laws.' ")).
Although some interstate compacts require congressional consent, this Compact did not. See U.S. Steel, 434 U.S. at 473, 98 S.Ct. 799 (holding that the Multistate Tax Compact did not "enhance[ ] state power" with respect to the federal government and therefore did not require congressional consent); see also U.S. CONST. art. I, § 10, cl. 3 (the Compact Clause). The Compact thus does not have the force of federal law because it has not been ratified by Congress. And as such, it remains a matter of state law. See Gillette, 196 Cal.Rptr.3d 486, 363 P.3d at 99 (holding California's version of the Compact to be state law).
Because the Compact is not federal law, Graphic is left to contend that Tax Code section 171.106 violates the Contract Clause as an unconstitutional impairment of the Compact's apportionment provisions. See, e.g., 1A NORMAN J. SINGER , SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 32:8 (7th ed. 2009) (describing state's authority to abrogate non-congressionally-approved compact as limited by "the constitutional prohibition against impairing the obligation of contract"). But, because of the severe consequence that may ensue when an earlier legislature contractually binds future legislatures, contractual intent must be unmistakable. Here it is not.
When states enter into contracts, the state's sovereign power may not "be held ... to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken." U.S. v. Winstar Corp., 518 U.S. 839, 874-75, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (quoting Jefferson Branch Bank v. Skelly , 66 U.S. (1Black) 436, 446 (1862)). This "unmistakability doctrine" serves "the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." Winstar , 518 U.S. at 875, 116 S.Ct. 2432. Accordingly, the "legislature is not presumed to have relinquished its power of taxation beyond the narrowest rational reading...." Atl. Coast Line R. Co. v. Phillips, 332 U.S. 168, 173, 67 S.Ct. 1584, 91 L.Ed. 1977 (1947). Each state is thus presumed to have reserved its sovereign tax power absent unmistakable language to the contrary. See Winstar , 518 U.S. at 878, 116 S.Ct. 2432 ("unmistakability [is] needed for waiver, not reservation" of sovereign power).
*105 The Compact contains no unmistakable language waiving the state's exercise of the sovereign tax power. See TEX. TAX CODE § 141.001. Nothing in the Compact expressly prohibits the states from adopting an exclusive apportionment method that overrides the Compact's formula. Id. Nor does the Compact expressly prevent its members from limiting, amending, or altogether deleting articles III.1 and IV. Id.
Graphic also refers to "taxpayers" as "[t]he parties that ... have an interest in enforcing party states' Compact obligations," but taxpayers are not parties to the Compact. Moreover, nothing in the Compact expressly or unmistakably makes taxpayers contractual, third-party beneficiaries of article III.1. See Tawes v. Barnes, 340 S.W.3d 419, 425 (Tex. 2011) (stating that third-party-beneficiary status requires clear and unequivocal intent to directly benefit third party). Such status is not conferred by implication, rather the presumption is that noncontracting parties are not intended beneficiaries. Sharyland Water Supply Corp. v. City of Alton , 354 S.W.3d 407, 420-21 (Tex. 2011).
Finally, there is the matter of our own constitution that prohibits the surrender of the sovereign tax power. TEX. CONST. art. VIII, § 4. A state's sovereign power to tax encompasses not merely whether to tax, but also what to tax-including the use of an apportionment method to determine the tax base subject to state tax. And as noted, thirteen other current or former Compact members have similar constitutional provisions.[15] Because these constitutional prohibitions predate the tax compact, they must be considered part of the Compact "as if they were expressly referred to or incorporated in its terms." U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 19 n. 17, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The Minnesota Supreme Court accordingly rejected the notion that the Compact's Article III.1 created a contractual obligation that violated the Minnesota Constitution. Kimberly-Clark , 880 N.W.2d at 850 (quoting MINN. CONST. art. X, § 1, which provides "[t]he power of taxation shall never be surrendered, suspended or contracted away").
Consistent with our constitutional prohibition on contractually suspending the sovereign tax power, the Compact's historical background likewise permits no inference that the states unmistakably considered Articles III.1 and IV as contractually binding terms. Graphic submits that the Multistate Tax Compact was in response to proposed federal legislation half a century ago that threatened to preempt the field of interstate taxation. The California Supreme Court agreed that there was "little doubt that, decades ago, the possibility of congressional action helped spur adoption of the Compact." Gillette , 196 Cal.Rptr.3d 486, 363 P.3d at 100. Even so, the California court could see no basis for interpreting the Compact as creating reciprocal obligations among its membership, finding it "more akin to the adoption of a model law." Id. What this history indicates is that states entered into the Compact to preserve each state's sovereign power to determine its own substantive tax policies, not to suspend that power by contract. The states did not hope to protect their tax powers from federal intervention only to permit contractual interference by other member states, much less by taxpayers. Rather, each state meant to retain unfettered control over its own tax policies.
Graphic nonetheless contends that the Compact's Article X.2 "allows only for complete withdrawal." Article X.2 provides:
*106 "Any party state may withdraw from this compact by enacting a statute repealing the same." TEX. TAX CODE § 141.001, art. X.2. But as the Minnesota Supreme Court observed, "nothing in the statute dictate[s] the 'all or nothing' position advanced by [the taxpayer]. At best, the statute is silent," and silence may not be construed as a waiver of the State's sovereign tax authority. Kimberly-Clark , 880 N.W.2d at 851 ; accord Gillette , 196 Cal.Rptr.3d 486, 363 P.3d at 101. Belying Graphic's assertion that the Compact is an all-or-nothing proposition or that Article III.1 is a core element is the Compact's recognition that its provisions are severable. See TEX. TAX CODE § 141.001, art. XII (stating that "[t]he provisions of this compact shall be severable"). The Compact thus does not provide that Articles III.1 and IV are inseparable parts of the Compact. Nor does anything in the Compact prevent member states from omitting or eliminating one or more of its provisions, while continuing to participate in the Compact in other respects. In fact, the Compact's severable nature is shown by its history. It was but five years after the Compact became effective that the membership unanimously ratified Florida's continued membership in the Compact after its legislature eliminated Articles III and IV, but did not otherwise repeal or withdraw from the Compact. Since then eleven other members have, without objection, either repealed Article III and IV, amended Article IV, passed legislation restricting the operation of Articles III and IV, or repealed the Compact and reenacted it without Articles III and IV.[16]
Finally, Graphic contends it should be allowed to use the Compact's formula because "[p]ermitting taxpayers to use the same apportionment formula in every state ... secures base line uniformity and compatibility." Whatever merit that argument might have had before the decisions in California, Minnesota, and Michigan, a uniform interpretation of the Compact in favor of a binding election is no longer possible. In California, Minnesota, and Michigan, Graphic will be required to use whatever mandatory apportionment formula that state requires. No compelling justification exists for why this restriction should apply to Texas and not to other Compact members.[17] As with interpreting uniform laws generally, the decisions of other states should be given additional weight here. See Nathan v. Whittington , 408 S.W.3d 870, 873 (Tex. 2013) (per curiam) (seeking to construe uniform laws "as consistent as possible with the constructions of other states that have enacted ... a similar provision").
* * * * *
We conclude from the above that the member states did not intend for the Compact to be a binding reciprocal agreement. The unmistakability doctrine, the lack of express restrictions in the Compact on the member states' power to delete or amend Articles III.1 and IV, the preexisting provisions in many member states' constitutions prohibiting contractual suspension of the tax power, the members' historical intent to preserve their sovereign tax powers, and the Compact's other provisions, such as the severability clause, persuade us that the member states did not intend for Articles III.1 and IV to be immutable, binding contractual terms. We therefore conclude that the Legislature acted within its plenary power in enacting Tax Code section 171.106 as the exclusive method for apportioning the Texas franchise tax and that the provision does not violate the *107 Contract Clause or otherwise undermine the Compact's purpose or efficacy.
The court of appeals' judgment is accordingly affirmed.

Section 171.106's gross-receipts fraction compares the taxpayers gross receipts in Texas (the numerator) with its gross receipts from its entire business (the denominator) and uses that single-factor formula to apportion the taxpayer's margin to this state. Tex. Tax Code § 171.106(a).

The Compact applies a three-factor formula that gives equal weight to the taxpayer's sales, property, and payroll. Id. § 141.001, art. IV.9. The formula compares the taxpayer's Texas sales to its total sales, the taxpayer's Texas property to its total property, and the taxpayer's Texas payroll to its total payroll, adds the three factors together, and divides the total by three to yield the taxpayer's apportionment fraction, which is then applied to the taxpayer's total income to determine the amount subject to tax in Texas. Id.

Chapter 112 of the Tax Code authorizes taxpayers suits for taxes paid under protest and for refunds. See id. §§ 112.052 (authorizing suit after payment under protest), .151 (authorizing suit for refund). The chapter requires the taxpayer to name both the Comptroller and Attorney General as defendants in such suits. Id. § 112.053(a). As in the court of appeals' opinion, we refer to the named public officials collectively as the Comptroller.

The IBM court, however, split evenly on whether the state's mandatory apportionment provision could be reconciled with the Compact's election feature. Id. at 883-84 (McCormack, J. dissenting) (concluding that the two were "irreconcilably in conflict"). A concurring justice broke the impasse, joining the plurality's judgment on different grounds. Id. at 881 (Zahara, J. concurring). The concurring justice noted he would not decide "[w]hether the Legislature repealed the Compact's election provision by implication when it enacted [the latter statute]." Id. Shortly after the plurality decision, the Michigan Legislature retroactively repealed the Compact. See Gillette Commercial Operations N. Am. & Subsidiaries v. Dep't of Treasury , 312 Mich.App. 394, 878 N.W.2d 891, 906 (2015), appeal denied, 499 Mich. 960, 880 N.W.2d 230 (2016) (discussing and upholding the retroactive repeal). Over state and federal constitutional objections, the Michigan courts have repeatedly upheld the repeal. See n.8 infra.

Article X.2 provides: "Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal." Tex. Tax Code § 141.001, art. X.2.

Under the Contract Clause, "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. , art. I, § 10, cl. 1 ; see also Tex. Const. art. I, § 16 ("No ... law impairing the obligation of contracts, shall be made.").

Thirteen other current or former Compact members have similar constitutional prohibitions. See Alaska Const. art IX, § 1 ; Ark. Const. art. 16, § 7 ; Cal. Const. art. XIII, § 31 ; Haw. Const. art. VII, § 1 ; Ill. Const. art. IX, § 1 ; Mich. Const. art. IX, § 2 ; Minn. Const. art. X, § 1 ; Mo. Const. art. X, § 2 ; Mont. Const. art. VIII, § 2 ; N.D. Const. art. X, § 2 ; S.D. Const. art. XI, § 3 ; Wash. Const. art. 7, § 1 ; Wyo. Const. art. 15, § 14.

Six separate certiorari petitions targeted this case and two latter decisions by different panels of the Michigan Court of Appeals to the same effect. The United States Supreme Court recently denied all six petitions. Sunoco Prods. Co. v. Mich. Dep't of Treasury, --- U.S. ----, 137 S.Ct. 2157, ----, 198 L.Ed.2d 245, 2017 WL 2216974, at *1 (2017) ; Skadden, Arps, Slate, Meagher & Flom, LLP v. Mich. Dep't of Treasury, --- U.S. ----, 137 S.Ct. 2157, ----, 198 L.Ed.2d 245, 2017 WL 2216975, at *1 (2017) ; Gillette Commercial Operations N. Am. & Subsidiaries v. Mich. Dep't of Treasury , --- U.S. ----, 137 S.Ct. 2157, ----, 198 L.Ed.2d 245, 2017 WL 2216976, at *1 (2017) ; Int'lBus. Mach. Corp. v. Mich. Dep't of Treasury , --- U.S. ----, 137 S.Ct. 2180, 2181, 198 L.Ed.2d 245, 2017 WL 2216977, at *1 (2017) ; Goodyear Tire & Rubber Co. v. Mich. Dep't of Treasury , --- U.S. ----, 137 S.Ct. 2157, 2158, 198 L.Ed.2d 245, 2017 WL 2216978, at *1 (2017) ; DIRECTV Grp. Holdings, LLC v. Mich. Dep't of Treasury , --- U.S. ----, 137 S.Ct. 2158, ----, 198 L.Ed.2d 245, 2017 WL 2216979, at *1 (2017).

The Commission's brief supports "the Comptroller's arguments that, despite its name, the Compact lacks the necessary elements of a binding regulatory agreement essential for Graphic Packaging to prevail on this issue." In addition to the Commission, the states of Alaska, California, Colorado, Hawaii, Idaho, Minnesota, Montana, New Mexico, North Dakota, Oklahoma, Utah, Washington and the District of Columbia join in an amicus brief prepared by the Oregon Attorney General that also supports the Comptroller's position. EMC Corporation, who has a similar franchise tax refund suit pending in the Austin Court of Appeals, and the Council on State Taxation, a nonprofit trade association based in Washington D.C., have filed amicus briefs supporting Graphic's arguments.

In addition to the current Compact membership, the Commission lists 33 other states that participate in its programs in one degree or another. See Member States, http://www.mtc.gov/The-Commission/Member-States (last visited on December 18, 2017). These states participate as either sovereignty members or associate members. Sovereignty members are states that support the purposes of the Multistate Tax Compact through regular participation in, and financial support for, the general activities of the Commission. Id. Associate members are states that participate in Commission meetings and otherwise consult and cooperate with the Commission and its member states or, as project members, participate in Commission programs or projects. Id.

The Comptroller lists the following Compact members who have altered or eliminated Article IV's apportionment method and Article Ill's election option: Alabama, Ala. Code § 40-27-1 ; Arkansas, Ark. Code §§ 26-5-101, 26-51-709 ; California, Cal. Rev. & Tax Code § 25128(a) (1993); Colorado, Colo. Rev. Stat. §§ 24-60-1301. 39-22-303.5(3)-(4); Dist. of Columbia, D.C. Code § 47-441 ; Florida, Fla. Stat. § 220.15(4) (1972) ; Idaho, Idaho Code § 63-3027(i)(1) ; Minnesota, Minn. Stat. §§ 290.171, .191 (1987); North Dakota, N.D. Cent. Code § 57-59-01 ; Oregon, Or. Rev. Stat. §§ 305.653, 314.606 ; Texas, Tex. Tax Code § 171.112(g) (1992), id. § 171.106(a) ; Utah, Utah Code § 59-1-801 (2010), id. § 59-1-801.5.

The Commission lists Alaska, Hawaii, Kansas, Montana, and North Dakota as members who adhere to the three-factor formula. See State Apportionment of Corporate Income, Federation of Tax Administrators (February 2017), https://www.taxadmin.org/assets/docs/Research/Rates/apport.pdf.

The Commission lists those who have modified the Compact's apportionment formula as Alabama, Arkansas, Colorado, Dist. of Columbia, Idaho, New Mexico, Oregon, Texas, and Utah. Id.

The Commission's listings do not account for two of its members, Missouri and Washington. According to the Commission's reference source, Missouri appears to adhere to the three-factor formula whereas Washington does not have a state income tax to which the Compact applies. Id.

See n.7 supra.

See n.11, supra.

See nn.12-14, supra and accompanying text.